**UNITED STATES of America, Plaintiff,**

v.

**GURLEY REFINING CO.,
et al., Defendants.**

No. J–C–87–291.

United States District Court,
E.D. Arkansas,
Jonesboro Division.

March 27, 1992.

Chuck Banks, U.S. Atty. by A. Douglas Chavis, III, Asst. U.S. Atty., Little Rock, Ark., Craig E. Johnson, Dept. of Justice, Washington, D.C., for plaintiff.

Bob Lawson, Jr., Lincoln & Lawson, Little Rock, Ark., Elton A. Rieves, IV, Rieves & Mayton, West Memphis, Ark., James W. Gentry, Jr., Gentry & Boehm, Chattanooga, Tenn., D. Allan Gates, Mitchell, Williams, Selig, Gates & Woodyard, Little Rock, Ark., for defendants.

Larry Gurley, pro se.

## MEMORANDUM OPINION AND ORDER

GEORGE HOWARD, Jr., District Judge.

The United States of America, on behalf of the United States Environmental Protection Agency (EPA), brings this action pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9601 *et seq.* to recover the costs it has incurred in connection with the response activities related to the Gurley Oil Pit Site in Edmondson, Arkansas. The United States also seeks a declaratory judgment of defendants' liability for all future costs it will incur in response to future releases or threats of releases posed by the Site.

## STATUTORY BACKGROUND

CERCLA was enacted in December 1980 "to initiate and establish a comprehensive response and financing mechanism to abate and control the vast problems associated with abandoned and inactive hazardous waste disposal sites." H.R.Rep. No. 1016(I), 96th Cong.2d Sess. 22, *reprinted in* 1980 U.S.Code Cong. and Admin News 6119, 6125. CERCLA was reauthorized and amended by the Superfund Amendments and Reauthorization Act of 1986 (SARA), which established the Hazardous Substance Superfund (Superfund), a fund used to finance the government's response to actual or threatened releases of hazardous materials.

CERCLA authorizes the Administrator of the EPA to respond with "remedial" or other "removal" action against any threatened or actual release of any hazardous substance that may pose an imminent and substantial public health threat. 42 U.S.C. § 9604(a).[1]

Under the statutory scheme, EPA has various options available to determine the most appropriate response to an actual or threatened release of hazardous substances into the environment. *See U.S. v. Ottati & Goss, Inc.*, 900 F.2d 429, 433 (1st Cir.1990) (discussion of four separate statutory paths that EPA might follow to clean up hazardous waste sites). For example, under § 106(a) of CERCLA, 42 U.S.C. § 9606(a), EPA may either seek equitable relief from a court or issue an administrative order requiring responsible parties to abate actual or threatened releases of hazardous substances or to take other appropriate actions. Under Section 104, 42 U.S.C. § 9604, EPA is authorized to undertake "response" activities to address the release or threatened release of a hazardous substance into the environment. Response activities include "removal" and "remedial" actions. 42 U.S.C. § 9601(25).

---

1. The statute authorizes the President of the United States to take certain actions. The President, however, has delegated most of his authority to the Administrator of the EPA. *See* Executive Order No. 12,580, 52 Fed.Reg. 2923 (Jan. 23, 1987), *reprinted in* 42 U.S.C. § 9615 App. at 223–227 (West Supp.1991).

Removal actions are short-term actions taken to halt any immediate risks posed by hazardous wastes, and include such actions as "may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment ..." 42 U.S.C. § 9601(23). Removal actions may precede remedial action which includes relatively long-term or permanent abatement activities. 42 U.S.C. § 9601(24).

In determining the appropriate response action, the Administrator "may undertake such investigations, monitoring, surveys, testing, and other information gathering" necessary to identify the existence and extent of the release or threat of release, the source and nature of the hazardous substances involved, and the extent of danger to the public health or welfare or to the environment. In addition, the Administrator may undertake a wide variety of studies or investigations necessary or appropriate to plan and direct the response actions. The Administrator may then bring an action to recover the costs incurred from those parties found to be responsible for the hazardous waste discharge. *See* 42 U.S.C. § 9604(b) and 9607(a).

Response actions must be consistent with the National Contingency Plan (NCP), which consists of EPA regulations establishing the methods and criteria for determining appropriate response to the release of hazardous substances. *See* 40 C.F.R. § 300.1 *et seq.* "Before any remedial action is undertaken, the site is studied, alternatives are examined, and a preferred cleanup remedy is selected in accordance with the administrative procedures set forth in the NCP. This process results in a site-specific study called a Remedial Investigation/Feasibility Study (RI/FS). *See* 40 C.F.R. § 300.430(d)–(f)." *Cooper Industries, Inc. v. U.S.E.P.A.*, 775 F.Supp. 1027, 1031 (W.D.Mich.1991).

After providing an opportunity for public comment concerning the proposed plan, the EPA selects the remedy that it plans to implement at the site and issues a "Record of Decision" (ROD) setting forth the final remedial plan. 40 C.F.R. § 300.435.

The EPA may respond to the problem by either implementing the remedial action itself, or it may seek to compel a third party to undertake the response action. If the EPA responds directly undertaking the removal or remedial action, it may then seek to recover its costs from the responsible parties. 42 U.S.C. § 9607(a).

## FACTUAL BACKGROUND

The Gurley Oil Pit site is located in Crittenden County, about 1 mile north of Edmondson, Arkansas. The site lies entirely within the watershed of the Fifteen Mile Bayou which is a tributary of the St. Francis River, which is a tributary to the Mississippi River. The site is located within the 100 year floodplain of Fifteen Mile Bayou.

The pit was excavated some time prior to 1970 when the Arkalite Company removed soils for use in aggregate production. In July, 1970, Gurley Refining Company, Inc. (hereinafter "Gurley Refining")[2] leased the pit area for a period of ten years from the landowner, R.A. Caldwell, for use as a disposal site for secondary oil refining wastes. The pit was divided into three smaller waste disposal cells when Gurley Refining installed two cross-levees in the fall of 1970.

In September of 1970, Gurley Refining obtained a waste disposal permit from the Arkansas Department of Pollution Control and Ecology (ADPC & E). From then until late 1975, Gurley Refining used the pit to dispose of sludge and filter material from the rerefining of used motor oil.

In May, 1975, an inspection by ADPC & E revealed that Gurley Refining was discharging contaminated stormwater from the pit into Fifteen Mile Bayou without

---

**2.** The EPA originally sued Gurley Refining Company, Inc.; Gurley Refining Company (a partnership); William Martin Gurley, Betty Gurley; Larry Gurley, and R.A. Caldwell. The partnership and Betty Gurley were dismissed pursuant to order dated June 15, 1990. The government subsequently settled with Caldwell. The consent decree was filed on September 25, 1991.

treatment. Gurley Refining was convicted on charges of permit violation and was given one year to implement site cleanup and remedial measures. In October, 1975, Gurley Refining closed part of its refining operation which generated wastes disposed at the site.

In December 1975, Gurley Refining returned its permit to ADPC & E stating that the waste disposal had ceased and that the site was secure. During 1978, personnel from the U.S. Fish and Wildlife Service reported to EPA and ADPC & E that overflows from the pit had damaged fish and waterfowl in the bayou. EPA directed work to treat and discharge the pit waters. By July of 1978, the spill was cleaned up and water levels in the pit lowered sufficiently to provide adequate capacity for further rainfall.

During April 1979, after heavy rains, the pit overflowed, releasing approximately 450,000 to 500,000 gallons of oil and oily wastes to surrounding farmlands, roads, and Fifteen Mile Bayou. EPA attempted to induce both Caldwell and Gurley Refining to conduct a cleanup operation. When they would not do so, EPA cleaned up the site under Section 311 of the Clean Water Act.

Periodic rains continued to fill the pit and pumping was required throughout the summer and fall of 1979. An inspection by ADPC & E in August, 1981, indicated that conditions at the site were essentially unchanged, although the trench installed by EPA in 1979 had caved in.

In August, 1983, the site was listed on the National Priorities List (NPL). In December, 1983, EPA authorized a remedial investigation (RI) to determine the nature, magnitude, and extent of contamination at the site. The RI work was conducted from February 1984 until May 1985. Analyses

of the results of the RI indicated the presence of a complex mixture of oil and oil waste. Numerous volatile organic and inorganic substances were found in the sludge, however, no significant level of contaminants were present in the subsurface soil samples. Organic and inorganic contaminates were present at low concentrations in the ground water. The possibility of lab contamination existed.

The Feasibility Study (FS) released April 18, 1986, contained four alternatives for the source control remedy.[3]

EPA selected the third alternative, a remedy which includes stabilization of the sludge, contaminated soil and sediment, and disposal of them in an on-site constructed RCRA landfill. EPA estimated the cost of the remedial action to be about $6 million, which includes costs for construction of the RCRA landfill cell, stabilization of the waste, backfilling of the excavated area and construction of flood protection, and onsite treatment of contaminated water. The estimated costs also includes annual groundwater monitoring, maintenance of the monitoring wells, cell cap and flood protection.

The EPA in its Enforcement Decision Document dated October 6, 1986, found that the alternative is "a cost effective remedy that provides adequate protection of public health, welfare, and the environment." (AR 100, pg. 002327).

The United States then brought this action to recover response costs associated with the 1986 administrative decision. William Gurley, Larry Gurley and Gurley Refining ("the Gurley defendants") object to the United States' action. By order filed June 14, 1990, the Court found that the United States had established a *prima facie* case of liability with respect to Gurley Refining and William Gurley.[4] A trial was

---

**3.** Following the source control RI/FS, EPA initiated a groundwater operable unit RI to identify background water quality. The final report of the RI/FS was issued August 1, 1988. The RI found that pit wastes have not leaked through the clay surrounding the pit. The ROD which was issued concerning the groundwater operable unit concluded that no action was necessary.

**4.** To establish a *prima facie* case of liability under CERCLA, the United States must establish that (i) there was a release or a threat of a release of a hazardous substance at the facility; (ii) as a result of the release or threatened release, the United States incurred response costs; and (iii) the defendant falls within one of the categories of responsible parties set forth in Section 107(a)(1)–(4). *U.S. v. Aceto Agricultural*

held concerning defendants' responsibility for the costs incurred by the United States. At trial, the Court found Larry Gurley to be a responsible party. All evidence is in, the parties have submitted post-trial briefs, and the matter is ready for decision.

The Gurley defendants raise a number of objections to the United States' cost recovery action: (1) this action is barred by *res judicata* and collateral estoppel; (2) certain evidence pertaining to costs and expenditure of attorney's fees should be stricken; (3) EPA's actions are arbitrary and capricious and the costs claimed are inconsistent with the National Contingency Plan (NCP). The Court will address each of these contentions.

## DISCUSSION

### *Res Judicata and Collateral Estoppel*

■ The Gurley defendants contend that the instant action is based upon the same injuries that were litigated in an earlier proceeding. In addition, the Gurley defendants contend that based on findings in previous actions, the United States is estopped from relitigating certain issues.

The parties were involved in two lawsuits prior to the instant one. In 1979, Caldwell brought a citizen's suit pursuant to 33 U.S.C. § 1365 against Gurley Refining Company, William M. Gurley, Larry M. Gurley, EPA and its Administrator, and the Secretary of the U.S. Department of Transportation. *Caldwell v. Gurley Refining Co.*, 533 F.Supp. 252 (E.D.Ark.1982). The action concerned the various problems concerning the pits that occurred in the 1970s. Caldwell sought an injunction ordering Gurley to comply with the Federal Water Pollution Control Act ("FWPCA") and an injunction ordering the EPA to enforce the FWPCA and a declaratory judgment as to his liability for the clean-up undertaken by the EPA. Caldwell further sought against defendant Gurley specific performance of the lease agreement and damages.

The Honorable Henry Woods, U.S. District Judge for the Eastern District of Arkansas, found that the court did not have

jurisdiction over a plaintiff's suit against the EPA brought pursuant to 33 U.S.C. § 1365(a)(2). Thus, the court dismissed the EPA. *Caldwell v. Gurley Refining Co.*, 533 F.Supp. 252 (E.D.Ark.1982).

Caldwell's claims for declaratory relief against Larry and William Gurley and the corporation proceeded to trial on October 3, 1983. The Court directed a verdict as to the individual claims against William Gurley and Larry Gurley. Based on the jury's responses to interrogatories, the court entered declaratory judgment in favor of Caldwell that the July 1979 lease remained in effect for its full term of ten years and that the Gurley Refining Company is responsible during that period of time for all pollution occurring to the navigable waterways of the United States and the State of Arkansas and their tributaries from operations of Gurley Refining Company at the lease site. (Defendants' Ex. 13).

The Gurley defendants contend that the court's directed verdict in favor of Larry Gurley and William Gurley as to their obligation to close the pits is *res judicata* as to all parties in this action.

The argument is without merit. The Court notes that the judgment does not contain the basis for the directed verdict. At the most it only concerns Larry Gurley's and William Gurley's obligations under the FWPCA and their obligations to perform under the lease. These are not issues in this lawsuit and there is nothing in the previous action to preclude EPA's present action under CERCLA to recover response costs.

■ In 1983, the United States brought an action against Caldwell and Gurley Refining Company pursuant to the Clean Water Act, 33 U.S.C. § 1321 *et seq.* for the costs the EPA incurred in removing the oil that had spilled from the Pits in 1978 and 1979. *U.S. v. Caldwell*, J–C–83–399. The case was tried before the Honorable William Overton, U.S. District Judge for the Eastern District of Arkansas. By order docketed October 30, 1985, Judge Overton found Caldwell and Gurley Refining jointly

*Chemicals Corp.*, 872 F.2d 1373, 1379 (8th Cir.     1989).

and severally liable for the discharge of oil in violation of the Clean Water Act and awarded the United States $76,758.60 for the costs it expended in the removal of the oil.

The Gurley defendants assert that Judge Overton's finding that the releases were that of oil, sludge, and/or waste oil, precludes a finding from this Court that the releases were of a hazardous substance.

The Court addressed this argument in the Court's order of June 14, 1990. The Court found that *res judicata* and collateral estoppel are not applicable in this instance. As the Court noted previously, the issues of whether a *hazardous substance* had been released was not litigated. The Court further stated:

> The previous action involved the clean up of oil that had spilled from the Pit in 1978 and 1979 and was brought pursuant to 33 U.S.C. § 1321. Here, the United States attempts to recover the costs it incurred in the remediation of the Pit since 1983. The causes of action are therefore different.
>
> Furthermore, CERCLA itself contemplates that the two actions can be brought, and that first will not bar the second. Pursuant to Section 113(g)(2), the United States may bring successive actions to recover further response costs or damages. 42 U.S.C. § 9613(g)(2). Thus, according to the language of the statute, the United States did not have to bring its section 107 action at the time it brought its action under the Clean Water Act.

(June 14, 1990 Order at pp. 8–9)

Defendants rely on two cases decided subsequent to the June 14th Order to support their assertion that the Court should reconsider its ruling. The Court has reviewed the cases, *Johnson v. SCA Disposal Services, Inc.*, 931 F.2d 970 (1st Cir. 1991) and *Aliff v. Joy Manufacturing Co.*, 914 F.2d 39 (4th Cir.1990), and finds that their holdings are not helpful to defendants' argument. They both involve private plaintiffs, where the first lawsuit concerned common law tort claims.

The Court is not persuaded that its original order of June 14th is incorrect, and finds that neither *res judicata* nor collateral estoppel bar this action. *See U.S. v. Fisher*, 864 F.2d 434 (7th Cir.1988) (earlier consent decree under the Resource Conservation and Recovery Act did not bar later CERCLA action).

Connected with these arguments is defendants' position that EPA has failed to demonstrate a release or threat of release other than the release in 1978 and 1979 which had already been litigated in the 1983 suit. The Gurley defendants point to the groundwater RI of 1988 in support of their position. That RI found that there had been no leaching of any materials contained in the oil sludge into the groundwater underneath the pits. The Gurley defendants further point out that in the Spring of 1989, the EPA issued an Emergency Order concerning the condition of the pit. Gurley Refining under the supervision of both the ADPC & E and EPA "dewatered" the pit, thereby alleviating the threat of any rainwater discharge from the pit.

CERCLA imposes liability on the owner and operator of a facility from which there is a release or a threatened release of a hazardous substance. 42 U.S.C. § 9607(a). A release is defined as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment" of a hazardous substance. 42 U.S.C. § 9601(22). In the June 14th Order the Court found that EPA had established that there was a release or threatened release of a hazardous substance at the site.

The record is replete with references to hazardous substances already present at the site (see e.g., AR Doc. 92, Endangerment Assessment). That contaminants have not been found in the groundwater does not eliminate the possibility of the threat of release. The Court finds, therefore, that EPA has established that there was a release of hazardous substances as well as a threat of release sufficient to impose liability under CERCLA. *See Dedham Water Co. v. Cumberland Farms*

*Dairy, Inc.*, 889 F.2d 1146, 1154 (1st Cir. 1989) ("To our knowledge, every court ... has held that it is not necessary to prove actual contamination of plaintiff's property by defendant's waste in order to establish liability under CERCLA.")

*Evidentiary Issues*

Both the United States and the Gurley defendants raise a number of evidentiary issues. The Gurley defendants move to strike certain of the United States' exhibits which are cost summaries.

Defendants move to strike Plaintiff's exhibits 87, 88, and 89, 109, 110 and 111.[5] They contend that (1) Exhibits 87, 88, 89 109, 110 and 11 should be stricken because of the United States' failure to make the underlying exhibits available to defendants in a timely fashion; (2) Exhibits 109, 110, and 111 are irrelevant; (3) Exhibits 87, 88, 89, 109, 110 and 111 should be stricken because no foundation for the underlying documents was ever laid. The Gurley defendants also contend that Exhibit 89 was never admitted into evidence.

With respect to the last assertion, that is, the status of plaintiff's exhibit 89, the Court finds that the exhibit was admitted into evidence. At the trial, the Court provided the United States an opportunity to lay a foundation for the admission of Exhibits 87, 88, and 89 (Tr. 512). After the direct testimony of William Kime, the accountant for the Department of Justice, the Court admitted the exhibits, subject to a possible motion to strike by defendants should they succeed in discrediting the exhibits (Tr. 564).

With respect to defendants' assertion that they did not have sufficient time to review the documents, the Court notes that the underlying documentation of the cost summaries is extensive. However, the Court is persuaded that defendants had ample opportunity to review the underlying documentation. Defendants could have en-gaged in more extensive discovery prior to trial. When defendants raised the timeliness issue prior to trial, the Court afforded defendants additional time to review the cost documentation and to interview witnesses prior to the commencement of the trial. Furthermore, defendants had ample opportunity to review the documentation during the 2½ month recess of the trial.

Defendants' argument concerning the relevancy of Exhibits 109, 110, and 111 is without merit. These reports were used by William Kime to calculate the indirect costs, contained in Exhibit 89. As Exhibit 89 is in evidence, the documents used by Kime as a basis for his calculations, i.e., Exhibits 109, 110, and 111, are relevant. Furthermore, Phillip B. Stiness, testified as to the accuracy and reliability of Exhibits 109–111.

Defendants' primary argument is that the exhibits should be stricken as the United States failed to lay the proper foundation for admissibility of these cost summaries. That is, defendants argue, the summaries are based on inadmissible hearsay. *See Ford Motor Co. v. Auto Supply Co.*, 661 F.2d 1171, 1175 (8th Cir.1981) ("A summary, if drawn from data that is inadmissible, likewise must be excluded.")

The United States argues that the underlying documents are admissible under the public records exception to the hearsay rule. Federal Rule of Evidence 803(8) provides that "[r]ecords, reports, ... or data compilations in any form, of public offices or agencies setting forth (A) the activities of the office or agency or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report ..." are not excluded by the hearsay rule.

The Court finds that the United States has met its burden to establish that the underlying documents are public records by demonstrating that the reports are from

---

5. Plaintiff's Exhibit 87 is a cost summary of Region VI EPA expenditures, Exhibit 88 is a cost summary of EPA's headquarter costs, and Exhibit 89 is a revised summary of the Environment and Natural Resource Division's costs relating to the case.

Plaintiff's Exhibits 109, 110 and 111 are the Department of Justice's expenditure and allotment reports for the fiscal years 1988, 1987, and 1989 respectively.

a public agency reflecting its work and there was a duty to report or prepare the documents. In particular, the NCP mandates that the EPA complete and maintain documents to support its action and to form the basis for cost recovery. According to 40 C.F.R. § 300.160 (1991): "[D]ocumentation shall be sufficient to provide the source and circumstances of the release, the identity of responsible parties, the response action taken, accurate accounting of federal, state, or private party costs incurred for response actions ..."

The Court finds that the cost summaries are admissible, and that the United States has provided adequate documentation to support its claim for costs. *See U.S. v. Bell Petroleum Services, Inc.*, 734 F.Supp. 771, 781 (W.D.Tex.1990).

Defendants argue in the alternative that if Exhibit 87 is not stricken, then attorneys' fees incurred by the United States in prosecuting this action should not be included as part of the costs. In particular, the Gurley defendants point to the order dismissing Betty Gurley and Gurley Refining Company, a partnership, stating that "the parties shall bear their own costs and attorney's fees in this matter." Defendants assert that because the United States can not determine what portion of its costs are directly attributable to preparing its case against the dismissed defendants, the Court should strike the United States' claim for all attorney's fees. The Court will address this argument later when discussing costs.[6]

*Recovery of Costs*

■ Pursuant to Section 107(a)(4)(A) of CERCLA, defendants are liable for "all costs of removal or remedial action incurred by the United States Government ... not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(A).

Defendants have the burden of showing the United States' response costs are inconsistent with the NCP. Those response costs not inconsistent with the NCP are conclusively presumed to be reasonable and therefore recoverable. *U.S. v. Northeastern Pharmaceutical & Chemical Co.*, 810 F.2d 726, 747 (8th Cir.1986), *cert. denied*, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987) (*"NEPACCO"*).

■ Furthermore, in order to avoid liability for response costs, defendants must demonstrate that the EPA's choice of response action was arbitrary and capricious or otherwise not in accordance with law based on the administrative record. 42 U.S.C. § 9613(j)(2). *See NEPACCO*, 810 F.2d at 748 ("Because determining the appropriate remedial and removal action involves specialized knowledge and expertise, the choice of a particular cleanup method is a matter within the discretion of the EPA. The applicable standard of review is whether agency's choice is arbitrary and capricious.")

■ In reviewing the administrative record, the Court should not attempt to substitute its judgment for the expertise of EPA officials. The Court's role, "as the CERCLA statute makes clear, is one of review on the administrative record, searching for errors of procedure and for glaring omissions or mistakes which indicate that EPA has acted arbitrarily and capriciously." *U.S. v. Akzo Coatings of America, Inc.*, 949 F.2d 1409, 1424–25 (6th Cir.1991).

■ The Gurley defendants assert that the proposed remedial action is arbitrary and capricious. In support of their position, they point to the fact that the ADPC & E did not agree to the proposed remedial action, and considered it not cost-effective and too extensive.[7] The state did not for-

---

6. The Court reserved a number of rulings pertaining to evidentiary issues. In its post-trial brief, EPA renews its objections to some portions of Michael Bates' testimony, and to testimony outside the administrative record. To the extent a discussion of these evidentiary issues is necessary, the Court will address them below.

7. Defendants also assert that EPA used flawed information in evaluating the Gurley site for listing on the NPL. According to defendants, EPA ignored advise by ADPC & E concerning the ranking of the site, and that its refusal to use correct data is arbitrary and capricious.

The designation of the site on the NPL cannot be challenged by defendants at this late date.

mally object in 1986 to the proposed remedy; instead it conveyed its concerns orally.[8]

ADPC & E began to object more vigorously to the proposed remedial action in 1988 after the RI/FS of the ground water operable unit and release of the design analysis by the U.S. Army Corps of Engineers. ADPC & E continued to contend that the proposed remedy was not cost-effective and further maintained that the proposed remedial action was not protective of the health and environment because of the possibility ground water contamination and the likelihood of hazardous air emissions (See, e.g., Plaintiff's Exhibits 21, 30, 31, 32, Tr. 989, 1114–1115). Instead of a RCRA vault, ADPC & E proposed that the pit water be treated, the remaining waste solidified, and capped in place with native clays (Plaintiff's Exhibit 30).

The Court is of the opinion that the dispute between ADPC & E and EPA is basically one of difference of opinion concerning the appropriate removal and remedial action. The Court is not persuaded that the EPA's choice is arbitrary and capricious. Defendants as well as the ADPC & E had ample opportunity to voice their opinions. The Court will not second guess the technical expertise of EPA. The record supports its decision.[9]

In furtherance of their position, defendants also point to the fact that the State had consistently refused to enter into a contract or cooperative agreement with EPA as required by 42 U.S.C. § 9604.[10]

Section 104(c)(3) bars expenditures from the Superfund for remedial actions unless the state enters into a cooperative agreement with the federal government. However, a number of courts have held that liability under Section 107(a) is independent of the authorized uses of the Fund and separate from the cooperative agreement required in Section 104(c)(3). That is, a cooperative agreement with the state is not a prerequisite for a cost recovery action brought pursuant to Section 107(a). *See U.S. v. Kramer*, 757 F.Supp. 397, 421 (D.N.J.1991); *United States v. Conservation Chemical Co.*, 619 F.Supp. 162, 208 (W.D.Mo.1985); *United States v. Wade*, 577 F.Supp. 1326, 1335–36 (E.D.Pa.1983).

Thus, the failure of the State to enter into a cooperative agreement with EPA does not bar recovery of costs by EPA. It is not an indication that the response actions are arbitrary and capricious. At the most, the lack of a cooperative agreement supports the Court's conclusion that the dispute between ADPC & E and EPA was a technical one concerning the appropriate remedy.

Furthermore, that the United States continued to incur costs despite the opposition of the state does not establish that the United States should not recover its costs. Certainly, CERCLA does not contemplate that EPA remain idle in the face of serious

42 U.S.C. § 9613(a), and the manner in which the site was evaluated and ranked cannot be used as an example of arbitrary and capricious action justifying the denial of costs under § 9613(g)(2).

8. At trial, Michael Bates, Chief of the hazardous waste division of ADPC & E, testified that the State did not submit written comments because based on past dealings, the State believed that EPA would ignore the State's concerns. The record reflects, however, that EPA was aware of the State's specific concerns (AR Doc. 100, pg. 002327).

9. In rebuttal, the United States called a chemist, Dr. Soundararajan, to testify concerning the remedy proposed by ADPC & E, that is, the use of Class C fly ash to solidify the waste (Tr. 1283—1275). Defendants then attempted to rebut the testimony of Dr. Soundararajan with their own scientists (Surrebuttal testimony of

Dr. John Smith, Dr. William Zuber, John Michael Hinds, November 13, 1990 and Dr. Daniel R. Marks, November 14, 1990). This testimony is, of course, outside the administrative record, and beyond the scope of review. However, the opinions of these "experts" merely demonstrate that courts should refrain from delving into highly technical areas; the decisions concerning appropriate actions are best left to those having the technical expertise and knowledge in the field.

10. By letter dated September 7, 1990, the ADPC & E and EPA reached agreement on the remedy to be implemented at the Gurley Oil Pit Site. ADPC & E now agrees to a RCRA vault, however, the design of the vault will be modified to address the State's concerns (Plaintiff's Exhibit 117).

threats to health and the environment. As mandated by the statute, EPA moved forward to develop a plan to deal with the problems at the Gurley site. That it did so in the face of opposition by the state does not warrant a finding that the EPA's actions are arbitrary and capricious.[11] Furthermore, that the remedy proposed is more expensive than one proposed by the state, or more expensive than defendants desired, does not warrant to a finding that the action is not cost-effective or the costs incurred are inconsistent with the NCP.

Finding that the costs are consistent with the NCP and that the action is neither arbitrary nor capricious, the Court must determine what costs the United States can recover. The statute provides that the United States is entitled to *all* costs not inconsistent with the NCP. 42 U.S.C. § 9607(a). Thus, the United States is entitled to all costs of administrative, investigative, construction, and enforcement activities incurred in connection with the site. 42 U.S.C. § 9604(b). *See e.g. U.S. v. Bell Petroleum Services, Inc.*, 734 F.Supp. 771 (W.D.Tex.1990) (United States entitled to indirect costs, litigation expenses, entire amount of feasibility study costs, prejudgment interest as of the date the cost accrued); *U.S. v. Hardage*, 733 F.Supp. 1424, 1432 (W.D.Okla.1989) (United States could recover investigative costs, litigation costs, but question of fact as to whether United States entitled to indirect costs); *U.S. v. NEPACCO*, 579 F.Supp. 823 (W.D.Mo. 1984), *aff'd in part and rev'd in part on other grounds*, 810 F.2d 726 (8th Cir.1986), *cert. denied*, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987) (government's response costs include investigations, monitoring and testing; planning and implementation of response action, and costs, including salaries and expenses, incurred associated with these activities).

The United States presented evidence of the costs it has incurred in connection with its response activities as of February, 1990.

The following is a summary of the costs incurred:

a. Payroll expenses of EPA headquarters employees in the amount of $1317.09;

b. Payroll expenses of Region VI employees of $75,649.33;

c. Travel expenses of Region VI employees of $10,050.80;

d. Payments to CH2MHill pursuant to contract work in the amount of $363,-255.14 pursuant to Contract No. 68-01-6692, Work Assignment No. 98-6139.0, and $305,270.00 in payments to CH2MHill for response activities conducted pursuant to EPA Contract No. 68-01-7251, Work Assignment No. 134-6139;

e. Payments to TechLaw pursuant to contract work in the amount of $47,-926.25;

f. Payments to Jacobs Engineering Group, Inc. in the amount of $28,855.79 for contract work;

g. Payments to Viar and contract laboratories participating the EPA's Contract Laboratory Program in the amount of $99,353.27;

h. Payments to Peer Consultants in the amount of $3,157.90 for contract work;

i. Payments to the State of Arkansas pursuant to Cooperative Agreement No. 646201 in the amount of $28,258.24;

j. Payments to the Department of Interior pursuant to an interagency agreement in the amount of $2,613.00;

k. Payments to the Army Corps of Engineers pursuant to an interagency agreement in the amount of $570,076.32;

l. Payments to the National Enforcement and Investigation Center (NEIC) in the amount of $6,878.87;

m. Payroll Expenses for responses activities conducted at the site by Department of Justice (DOJ) personnel in the amount of $13,472.80;

---

11. Steve Gilrein, an EPA employee who has been responsible for the Gurley Pit site since 1987, testified that the EPA had a number of meetings with state personnel to discuss the design. EPA was aware of the state concerns, but believed that the EPA had a verbal commitment from the ADPC & E to provide the state ten percent match prior to contracting with the Corps of Engineers to do the design (Tr. 356-360).

n. Costs of at least $2,440.85 in other direct costs for response activities conducted at the site by DOJ personnel;

o. Indirect costs in the amount of $28404.89 for activities performed by DOJ personnel;

p. Indirect costs in the amount of $201,-839.50.

In total, the United States seeks response costs in the amount of $1,786,502.92 for costs incurred as of February 28, 1990. The Court notes that while defendants argue in general that EPA's choice of response action is arbitrary and capricious, and that the costs are inconsistent with the NCP they do not point to any particular cost as not a proper response cost.

As noted above, the Gurley defendants assert that the United States is not entitled to attorney's fees based on the language of the order dismissing Betty Gurley and the partnership. That order provided that "the parties shall bear their own costs and attorney's fees in this matter." Defendants assert that because the United States could not establish the exact amount of costs attributable to the prosecution of the case against the dismissed defendants, all attorney's fees should be excluded.

■ The majority of courts have imposed joint and several liability in cases under § 107 unless the defendants are able to establish that a reasonable basis exists for apportioning the harm among them. *United States v. Wade*, 577 F.Supp. 1326, 1338 (E.D.Pa.1983). *See also United States v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1507 (6th Cir.1989), *cert. denied*, 494 U.S. 1057, 110 S.Ct. 1527, 108 L.Ed.2d 767 (1990) (While CERCLA does not mandate the imposition of joint and several liability, it permits it in cases of indivisible harm); *United State v. Monsanto*, 858 F.2d 160, 171–72 (4th Cir.1988), *cert. denied*, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989) (CERCLA has been interpreted to impose joint and several liability); *Kelly v. Thomas Solvent Co.*, 714 F.Supp. 1439, 1448 (W.D.Mich.1989) (where two or more defendants are responsible for an indivisible harm, each is subject to liability for the whole harm).

In this instance the harm is indivisible. That the United States agreed to waive its claim for attorney's fees with respect to the dismissed defendants does not excuse the remaining defendants from their responsibility for attorney's fees. The Court finds that the remaining Gurley defendants are jointly and severally liable for all costs, including attorney's fees.

A review of the costs incurred may lead one to surmise that they are excessive. Indeed, much money has been spent determining the remedy; the remedy, however, has yet to be implemented. Despite the seeming enormity of the costs incurred, the Court must conclude that the United States is entitled to recover them. As one district court perhaps a little forcefully stated:

> Taking a broader look at the purposes behind CERCLA, the Court does not find therein Congress' desire to allow a responsible party to sit back and watch the Government sift through the rubble of a polluted site, formulate a remedial solution and take action and then attack every cost associated therewith. This Court is of the opinion gross misconduct on the part of the Government could bar recovery. Yet the Court keeps in mind the fact the wrongdoers herein had the option of taking responsibility for their own actions at the outset, which, had they done so, would unquestionably have limited certain costs. Our Government, God bless her, is a bureaucratic monster which, by definition, runs inefficiently.... Many, many costs would have been unnecessary had the Defendants shouldered the burden and sought to quickly and efficiently clean up the mess they made. Instead, their free ride has increased costs exponentially, including all the bureaucratic expenses typical of a large Government, costs of discovery and trial, Court costs ... the list is unending.

*U.S. v. Bell Petroleum*, 734 F.Supp. at 780–81.

In sum, the Court finds that the United States is entitled to recover costs as set forth above in the amount of $1,786,502.92 for costs incurred to February 28, 1990.

CERCLA also authorizes recovery of prejudgment interest. 42 U.S.C. § 9607(a) ("The amounts recoverable in an action under this section shall include interest on the amounts recoverable. Such interest shall accrue from the later of (i) the date payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned.") Here, there is no indication when any specific amount was demanded. Indeed, the total amount claimed was not made known to defendants until the conclusion of the United States' case in chief. Thus, the Court will award prejudgment interest from September 10, 1990, or the date the United States rested with respect to its cost recovery action.

■ The United States also seeks a declaratory judgment of the liability of the Gurley defendants for future response costs associated with the Gurley site. 42 U.S.C. § 9613(g)(2) (in an action for recovery of costs, "the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or action to recover further responses costs or damages.") *See U.S. v. Alcan Aluminum Corp.*, 755 F.Supp. 531, 543 (N.D.N.Y.1991) (court enters declaratory judgment in plaintiffs' favor that defendant liable to plaintiffs for future response cost associated with the site); *U.S. v. Hardage*, 733 F.Supp. 1424, 1439 (W.D.Okla.1989) (while the Court cannot award costs until they are incurred, the Court can determine liability for future response costs). Thus, the Court grants the United States' request for declaratory judgment in its favor and against defendants with respect to liability for future response costs.

## CONCLUSION

In sum, the Court finds that the Gurley defendants are jointly and severally liable to the United States for $1,786,502.95 for costs incurred in connection with response activities at the Gurley pit Site as of February, 1990; prejudgment interest at the statutory rate from September 10, 1990. Declaratory judgment is also entered in favor of the United States and against defendants for future response costs to be incurred at the Gurley Pit Site.

IT IS SO ORDERED.