**UNITED STATES of America, Plaintiff,**

**v.**

**VERTAC CHEMICAL CORP.,
et al., Defendants.**

**No. LR–C–80–109.**

United States District Court,
E.D. Arkansas,
Western Division.

Oct. 23, 1998.

**771**

Sam Blesi, Department of Justice, Land & Natural Resources Division, Washington, DC, A. Douglas Chavis, III, United States Attorney's Office, Eastern District of Arkansas, Little Rock, AR, for the United States.

Charles L. Moulton, Attorney General's Office, Little Rock, AR, for the State of Arkansas.

V. Robert Denham, Jr., Powell, Goldstein, Frazer & Murphy, Atlanta, GA, Charles L. Schlumberger, Wright, Lindsey & Jennings, Little Rock, AR, for Hercules, Inc.

Steven W. Quattlebaum, Williams & Anderson, Little Rock, AR, for Uniroyal Chemical.

## MEMORANDUM OPINION AND ORDER

GEORGE HOWARD, JR., District Judge.

After eighteen years of litigation, and the expenditure of over $102,000,000.00 to date, the United States of America is ready to recover its costs associated with the cleanup of the Vertac Site pursuant to Section 107 of the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9607.[1] The United States has filed a motion for summary judgment on the issue of costs. The two parties found to be jointly and severally liable, Uniroyal Chemical, Ltd. (Uniroyal) and Hercules Incorporated (Hercules), object and argue that the United States is not entitled to recovery of costs as the actions of the United States Environmental Protection Agency (EPA) were arbitrary, capricious and not in accordance with law. They have filed motions for summary judgment with regard to EPA's claims.[2]

The Vertac Plant Site (site) is located in Jacksonville, Arkansas. The site was used for the manufacture of herbicides and other chemicals since the 1940s. As a result of the production, the land, buildings, equipment, groundwater, sewer lines, two sewage treatment plants, and flood plains and adjacent creeks became contaminated with 2,3,7,8–TCDD (dioxin) and other chlorinated carbon compounds. In 1983, EPA placed the site on the National Priority List (NPL) of Superfund cleanup sites established pursuant to Section 105 of CERCLA.

In carrying out the response measures, EPA divided the site into five units Off-Site Areas, Operable Units 1,2 and 3, and the Incineration response action. There were several removal actions that consisted of re-

---

1. The history of the Vertac Site and Off–Site areas has been discussed in a number of decisions. *See United States v. Vertac Chemical Corp.*, 966 F.Supp. 1491, 1494 n. 1 (E.D.Ark. 1997).

2. Uniroyal and Hercules have adopted each other's motion for summary judgment.

moving the immediate threat posed by the thousands of drums of waste containing hazardous substances left on the site when it was abandoned. Four remedial actions addressed the long-term solutions for the rest of the site and the surrounding area affected by the site. For each of the remedial actions, the National Contingency Plan (NCP) required the EPA (1) to conduct a "remedial investigation" (RI) of the site conditions, including an "endangerment assessment" (EA) of the threats posed by the contamination at the site; (2) to perform a "feasibility study" (FS) examining the various technical alternatives for remediating the site; (3) to take public comment on EPA's proposed remedial action plan based on the alternatives discussed in the FS; (4) to compile an administrative record for remedial action decision making; and (5) to issue a written ROD explaining the agency decision-maker's (the Regional Administrator) reasoning in selecting the final remedial action plan, and responding to the public comments received. The Court will first discuss the response actions at each of the units and second the arguments raised by the parties.

## FACTUAL BACKGROUND

### Incineration Response Action

When Vertac abandoned the site, it left behind more than 28,500 drums containing 2,4-D (Dichlorophonoxyacetic Acid) and 2,4,5-T (Trichlorophenoxyacetic Acid) still bottom wastes, dioxin and other hazardous and toxic substances. In addition, bulk storage tanks containing process materials and substantial quantities of contaminated trash remained on-site. According to an August 19, 1987 Action Memorandum, the drums were leaking potentially hazardous material, were stored in deteriorated sheds, on uncurbed concrete pads, and in open fields.

Over 15,000 drums were stored outside exposed to the elements. Drums were stacked three high on deteriorating wooden pallets. EPA determined that the wastes on the site posed a threat to public health and welfare and the environment. Residents in the area could be exposed to hazardous substances and should a large release occur, in the event of a tornado, fire, or continued poor maintenance, the toxic waste would contaminate the environment. EPA initiated a removal action in 1987 to stabilize the drums and tanks and to provide site security. By February, 1989, the failed drums had been placed inside new, larger drums (overpacked) and the tanks had been stabilized. However, the corrosive materials in the drums and tanks continued to cause deterioration and drum and tank inspection and maintenance were an ongoing project.

The drummed material was considered acutely hazardous waste and was characterized as "F-listed" waste under applicable Resource Conservation and Recovery Act (RCRA) regulations, 40 C.F.R. Part 261, App. VII.. Because of the characteristics of the wastes involved, EPA chose to dispose of the wastes by incineration. The Arkansas Department of Pollution Control and Ecology (ADPC & E or the State) entered into a contract for the drum incineration, and planned to fiance the cleanup with $10.7 million provided by Vertac.[3]

EPA proposed to conduct a removal action to support the State's incineration efforts. This removal action was performed as a "non-time critical" removal action. EPA performed an Engineering Evaluation/Cost Analysis (EE/CA) in 1989 with regard to the non time-critical action to provide support for the State's incineration project.[4] After the EE/CA was completed, EPA conducted a public meeting and solicited public comments on its proposed support measures.

3. The $10.7 million consisted of a $6.7 million trust fund established by Vertac and a $4 million letter of credit provided by Vertac.

4. Under the 1990 National Contingency Plan (NCP), EPA must complete an environmental evaluation cost analysis (EE/CA) when it determines that "a planning period of at least six months exists before onsite activities must be initiated ..." Removal actions having such a

planning period are referred to as "non-time critical removal actions." The term "time critical removal actions" refers to removal actions which do not allow for a six month planning period. The NCP does not require an EE/CA for time-critical removal actions. 40 C.F.R. § 300.415(b)(4)(i). The incineration support action was not a "time-critical" action, while the incineration itself was.

ADPC & E signed a contract with MRK, Inc. in July, 1989, for the incineration of the 28,500 drums of still bottom wastes. MRK, Inc. subsequently entered into a joint operating agreement with Morris–Knudsen, Inc., creating the venture known as Vertac Site Contractors (VSC). VSC erected a conventional rotating kiln incinerator. The first trial burn was completed in December, 1990. In April, 1991, ADPC & E notified VSC that the trial burn would have to be repeated because of, among other reasons, data gaps, and unacceptable laboratory procedures. After numerous delays, a second trial burn was conducted in October, 1991.[5] Approval of the second trial burn and certification to incinerate dioxin wastes were announced by the State on January 2, 1992.[6]

A dispute developed between the State and VSC regarding compensation for "downtime." Claims by VSC would have used up the amount available from the trust fund. Eventually, the State and VSC signed an agreement for the continued incineration of the wastes. The State agreed to pay VSC for certain "downtime," and also agreed to increase the compensation rate from approximately $850.00 per ton to $2,800.00 for continued incineration until the trust fund was depleted.

The State managed the incineration until June 3, 1993, when the State notified EPA that it was terminating its incineration contract with VSC. Prior to that time, EPA's role had been to support the State by maintaining the drummed waste, moving drums from storage facilities on-site to the incinerator, conducting ambient air monitoring around the site and in residential areas, testing salt and ash residuals and disposal of the delisted ash residue.

When it became apparent that the State was not going to be able to complete the incineration of the drummed waste with the funds it had available, EPA began considering its options for the disposal of the remaining drummed waste. On September 28, 1992, the EPA Regional Administrator for EPA Region VI requested approval of a federal removal action and an exemption from the statutory $2 million ceiling increase and one year time limit for removal actions under CERCLA. 42 U.S.C. § 9604(c)(1)(C). The

---

5. The delays include a citizens' lawsuit in federal court, *National Toxics v. Arkansas Pollution Control & Ecology*, LR–C–91–194 (filed April 1, 1991) attempting to stop the trial burn.

6. Incineration drew community opposition based on the assertion that it was not safe. In a complaint filed by the Arkansas Peace Center, Environmental Health Association of Arkansas, Jacksonville Mothers' and Children's Defense Fund, Veterans of America, Arkansas State Chapter, and Mothers Air Watch, the plaintiffs challenged incineration on the basis that the State had not demonstrated that the incinerator could achieve a 99.9999% destruction and removal efficiency ("DRE") on the dioxin (the "six nines" requirement). 40 C.F.R. § 264.343. The plaintiffs sought injunctive relief to stop the incineration and to require EPA and ADPC & E to prepare a RI/FS to determine treatment and disposal options other than incineration for the hazardous wastes stored at the site. In that case, then Chief Judge Reasoner allowed two scheduled test burns of the T-wastes to go forward, but enjoined VSC from further incineration of the T-wastes until a hearing on the request for a preliminary injunction. At a subsequent hearing, the court extended the injunction to prohibit the incineration of D-wastes. On March 17, 1993, Judge Reasoner entered a preliminary injunction barring all incineration of drums of hazardous wastes that had not already been shredded in preparation for incineration. The court concluded that the regulation requires that the incinerator demonstrate a six nines DRE on dioxin itself rather than on a surrogate principal organic hazardous constituent. *See Arkansas Peace Center v. Arkansas Dept. of Pollution, Control and Ecology*, 1993 WL 95654 (E.D.Ark.1993). The Eighth Circuit Court of Appeals reversed, finding that the court did not have jurisdiction to challenge a removal action pursuant to 42 U.S.C. § 9613(h). *Arkansas Peace Center v. Arkansas Dept. of Pollution, Control and Ecology*, 999 F.2d 1212 (8th Cir.1993), *cert. denied*, 511 U.S. 1017, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994). In dicta, the court found that the district court erred in finding that the regulation required demonstration of six nines DRE on dioxin.

In its prior order staying the preliminary injunction, which was subsequently reversed, the Eighth Circuit noted the risks of allowing the hazardous wastes to remain untreated. "We think granting the stay, and allowing the incinerator to operate, serves the public interest because doing nothing to the thousands of drums of hazardous wastes involves substantial risks of accidental and uncontrolled releases of toxic substances into the environment, whereas incineration destroys the toxic substances." *Arkansas Peace Center v. Arkansas Dept. of Pollution, Control and Ecology*, 992 F.2d 145, 147 (8th Cir. 1993).

Regional Administrator determined that immediate federal removal action was necessary to complete the incineration as the state's trust funds were insufficient to complete the incineration and there was the risk of exposure to the population by the threat of release, fire or explosion if the wastes were not incinerated. EPA determined that an imminent threat to the community existed given that over 16,000 drums remained containing highly corrosive and hazardous wastes.[7]

In its September 28, 1992, Action Memorandum, EPA evaluated alternative responses to the threat to public health, welfare, and the environment posed by the onsite drums. EPA evaluated seven options including continued drum maintenance without treatment, on-site incineration, off-site incineration, and stabilization and on-site landfilling of the wastes. Continued drum maintenance was ruled out because it did not eliminate the threat. On-site landfilling was eliminated because it could not be done in compliance with RCRA regulations banning land disposal of F-listed wastes and, in any event, the waste could not be effectively stabilized for landfilling. Off-site incineration was ruled out because the only facility in the country permitted to incinerate dioxin waste was unable to do so because of a limited permit. EPA determined that on-site incineration of the wastes, after also considering the costs, was the preferred method of addressing the threat posed by the drummed wastes.

EPA therefore took over the on-site incineration of the drums to mitigate the threat presented and to avoid any delay in the disposal process. By conducting the incineration as a time-critical removal action, EPA was able to resume incineration of the drummed waste on June 8, 1993.

In August, 1994, EPA continued to find that the on-site drums presented a significant threat to human health, welfare, and the environment. EPA's concern about the threat of fire and explosion had been heightened by a fire that broke out in an on-site office building on May 20, 1994. EPA continued to note the danger presented by the possibility of a tornado.

In August, 1994, EPA became aware that APTUS, a commercial facility located in Coffeyville, Kansas, was permitted to process dioxin wastes. EPA decided to ship the remaining 3,260 drums of 2,4,5–T wastes to APTUS. In an August 15, 1994, Action Memorandum, EPA documented that the cost to incinerate Vertac drummed waste at the APTUS facility would be similar to the on-site incineration costs, and that incineration both on-site and off-site could shorten the time for on-site incineration. Thus, both on-site and off-site incineration was determined to be the preferred removal response.

EPA completed the on-site incineration of the 2,4–D drummed waste in October, 1994. The Vertac on-site incineration activities ceased in January, 1995. Off-site shipment of the 2,4,5–T drums was completed in March, 1996.

After the completion of the on-site incineration, EPA had to arrange for the disposal of the salt and ash residual. Based on sampling, EPA determined that neither the salt

---

7. In describing the threats to public health or welfare of the remaining drums, EPA stated in the September 28, 1992, action memorandum:
   The drum contents are highly corrosive and some drums have been overpacked a number of times. Drum failures could cause exposure to nearby residents. The threat of an onsite fire causing the drum contents to ignite is significant. Neighborhoods are within 300 yards of the material and dibenzo-p-dioxins and furans would be expected to be released both directly and as products of incomplete combustion if burned under uncontrolled circumstances.

  .    .    .    .    .

   The drums contain high volumes of flammable solvents. Weather conditions in the vicinity of Jacksonville include frequent thunderstorms and lightning strikes, and the area has a high incident of tornadoes. A fire on the site could ignite the drummed waste which could spread chlorinated dioxins above the action level to nearby residential areas. The entire east and south perimeters of the site are residential areas. The Little Rock Air Force Base is a relatively short distance to the northwest. Some residences are within a few hundred yards of the largest concentration of the drums.

   September 28, 1992 Action Memorandum at 11–12 (Administrative Record 03358632–03358633).

nor ash was contaminated with dioxin at concentrations above one part per billion (ppb), the allowable limit for land disposal. While the salt contained levels of other materials (cadmium, chromium or lead) which exceeded allowable concentrations for land disposed wastes, EPA determined that the salts could be treated to be eligible for on-site disposal in a RCRA Subtitle C landfill.

This was done as a non-time-critical removal action. On March 5, 1996, EPA submitted an addendum to the original June 12, 1989 EE/CA and submitted it for public comment. The community expressed concern about the size of the on-site landfill. EPA determined that the ash and shredded pallets could be disposed of in the on-site RCRA landfill because of the low dioxin levels. The salt was sent off-site to a RCRA landfill because of the high volume of the salt (34,000 drums) and concern that the size of the existing on-site landfill not exceed 25 feet, the maximum height which the community was willing to accept.

· The incinerator was decontaminated and dismantled for placement in the on-site hazardous landfill. Pursuant to a December 20, 1996, Action Memorandum, EPA decided to issue a unilateral administrative order to Hercules, Uniroyal, and Vertac. The recipients of the order would be required to dismantle the incinerator and its associated structures and debris and decontaminate these materials. The drum disposal removal action was completed during the summer of 1997.

### Off–Site Areas

The Off–Site areas consist of the locations near the site where hazardous substances came to be located. The initial RI was performed between the fall of 1983 and spring of 1985. The purpose was to determine if dioxin had migrated beyond the plant site and, if so, to identify contaminated areas. The initial Vertac Offsite FS identifying seven potential alternatives for offsite remediation was completed in June, 1986. A public meeting was held in Jacksonville, Arkansas on July 15, 1986, to explain the results of the FS, answer questions and accept comments.

Because of amendments in 1986 to CERCLA, the selection of a remedy was postponed. EPA completed a supplemental FS in June, 1990. Pursuant to section 117 of CERCLA, 42 U.S.C. § 9617, EPA published notice, in July, 1990, of the completion of FS and of the proposed plan for remedial action for the off-site areas and provided for public comment on he proposed plan.

The ROD was issued in September, 1990 to address contamination in the off-site areas, including sewage collection lines, the old sewage treatment plant, the West Wastewater Treatment Plant, Rocky Branch Creek, and Bayou Meto Flood Plain. The remedy, which was completed in April, 1998, included the excavation of soils from the Rocky Branch Creek flood plain, removal of sediments from the sewage collection lines, removal of sludge from the sludge digester at the sewage treatment plant, and the excavation of dioxin contaminated soil from the banks of the Rocky Branch Creek and replacement with clean soil.

Hercules performed the remedial design and construction work under a CERCLA Unilateral Administrative Order (UAO) with EPA oversight.

### On–Site Operable Unit No. 1 (OU # 1) (Above Ground Media)

From March, 1987 through April, 1988, EPA performed an inventory of the process vessels (e.g. storage tanks, chemical reaction vessels) in the central process area. A sampling of the vessels in 1991 revealed the presence of dioxin.

The OU # 1 FS and RI were finalized at the end of March, 1991, and the proposed plan was released in February 1993. Hercules conducted the RI/FS pursuant to an Administrative Order on Consent (AOC) with EPA. A public comment period was held from February through April, 1993 and the ROD for OU # 1 was issued on June 30, 1993.

The ROD addressed the contaminated above-ground structures in the main production area of the Vertac Site. It required that plant equipment be dismantled and salvaged to the extent possible, and that all · other nonsalvageable material be placed in an on-

site landfill. Any hazardous material not suitable for the landfill was to be incinerated.

Hercules implemented the remedy pursuant to a UAO and completed all work in early 1998.

### Operable Unit # 2 (OU # 2) (Soils, Foundations and Underground Utilities)

Between 1989 and 1992, a RI was conducted to determine the levels of hazardous substances present in the soils at the site. Hercules performed the RI/FS pursuant to an AOC. The RI was finalized in December, 1992, and the FS was finalized in April, 1995.

Following the release of the original proposed plan for OU # 2 in May, 1995, and the subsequent community meeting, the EPA Administrator issued a series of administrative reforms for the Superfund Program requiring EPA to revise the proposed plan of action of OU # 2. EPA issued a Supplemental Proposed Plan in February, 1996, and presented it to the public. The public objected to the proposed plan, which proposed on-site landfilling of soil contaminated with dioxin in excess of 50 ppb.

In light of community concerns EPA re-evaluated the FS and two proposed plans. The ROD for OU # 2 was signed in September, 1996, and addressed contaminate on-site soils, foundations, underground utilities at the site, as well as contaminated off-site soils and sediments that had previously been excavated from off-site areas and stored on the site. The remedy selected required the excavation of dioxin contaminated soils, and the disposal of this soil in the on-site containment vault. Hercules performed the remedial design and construction pursuant to a UAO. The work was completed in May, 1998.

### Operable Unit No. 3 (OU # 3) (Groundwater)

The ROD for OU # 3, issued September, 1996, dealt with ground water contamination under the site. During the RI process, additional groundwater monitoring wells were installed to determine the nature and extent of non-aqueous phase liquid contamination. After consideration by EPA of the remedial alternatives set forth in the FS, it selected a remedy that focused on controlling the off-site migration of contaminated groundwater by installation of extraction wells, as well as the continued operation of the french drain system.

The remedy was expected to be completed this year.

### The Jacksonville and Rogers Road Landfills

As a result of citizens' complaints, EPA first investigated the Jacksonville and Rogers Road Landfill sites in 1983. Site investigations revealed the presence of rusting drums, strong chemical odors and damage to flora and fauna indicating contamination. Subsequent RIs confirmed that dioxin, 2,4,5–T, 2,4,5–TP and other chemicals had been disposed of and released at both sites. EPA completed its FS, received public comments on the available remedies and held a public meeting in 1990.

EPA issued RODs for the two landfills in September, 1990, which required the excavation of contaminated soils, replacement and capping with clean soil, cleaning and removal of large refuse items. The contaminated soil and drums were incinerated at the Vertac site. EPA began remedial work at each site in 1994, and completed all work in 1995.

## ANALYSIS

CERCLA was amended by the Superfund Amendments and Reorganization Act of 1986 ("SARA"). SARA added section 113(j) setting forth the standard for judicial review of a cost recovery action filed under Section 107.

(1) Limitation

In any judicial action under this chapter, judicial review of any issues concerning the adequacy of any response action taken or ordered by the President shall be limited to the administrative record. Otherwise applicable principles of administrative law shall govern whether any supplemental materials may be considered by the court.

(2) Standard

In considering objections raised in any judicial action under this chapter, the court shall uphold the President's decision in selecting the response action unless the objecting party can demonstrate, on the

administrative record, that the decision was arbitrary and capricious or otherwise not in accordance with law.

42 U.S.C. § 9613(j).

In performing this narrow review, the Court

looks to whether the agency considered those factors Congress intended it to consider; whether the agency considered factors Congress did not intend it to consider; whether the agency failed entirely to consider an important aspect of the problem; whether the agency decision runs counter to the evidence before it; whether there is such a lack of a rational connection between the factors found and the decision made that the disputed decision cannot "be ascribed to a difference in view or the product of agency expertise."

*Downer v. United States,* 97 F.3d 999, 1002 (8th Cir.1996).

■■■ Pursuant to Section 107(a)(4)(A) of CERCLA, defendants are liable for "all costs of removal or remedial action incurred by the United States government … not inconsistent with the National Contingency Plan." 42 U.S.C. § 9607(a)(4)(A). Defendants have the burden of demonstrating that the United States' response costs are inconsistent with the NCP. Additionally, defendants must demonstrate that the EPA's choice of response actions was arbitrary and capricious or otherwise not in accordance with the law based on the administrative record. *United States v. Gurley,* 788 F.Supp. 1473, 1481 (E.D.Ark.1992), *aff'd* in part, *rev'd* in part and remanded, 43 F.3d 1188 (8th Cir.1994), *cert. denied,* 516 U.S. 817, 116 S.Ct. 73, 133 L.Ed.2d 33 (1995) (citing *United States v. Northeastern Pharmaceutical (NEPACCO),* 810 F.2d 726, 748 (8th Cir.1986),*cert. denied,* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987)). "To show that the Government's response action is inconsistent with the NCP, a defendant must demonstrate that the EPA acted arbitrarily and capriciously in choosing a particular response action to respond to a hazardous waste site." *United States v. Hardage,* 982 F.2d 1436, 1442 (10th Cir.1992), *cert. denied,* 510 U.S. 913, 114 S.Ct. 300, 126 L.Ed.2d 248 (1993) (citing *NEPACCO,* 810 F.2d at 748).

■■■ Both Uniroyal and Hercules contend that even under the deferential "arbitrary and capricious" standard of review the Court must take a "hard look" at the administrative record. Under this approach, defendants argue that the Court must determine whether EPA used the correct methodology, applied the proper criteria, considered relevant factors, chose from the range of options, relied upon appropriate policies, and found adequate support in the record for material empirical propositions.

Defendants have confused the "hard look" required of agencies in making decisions with the standard of review a federal court must apply in reviewing an agency decision. *See Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 374, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (National Environmental Policy Act of 1969 (NEPA) requires that *agencies* take "hard look" at the environmental effects of their planned action); *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 356, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989); *Sierra Club v. U.S. Forest Service,* 46 F.3d 835, 838–39 (8th Cir.1995) (under arbitrary and capricious standard, court must affirm agency's decision if the *agency* took a "hard look" at the project); *Audubon Soc'y of Cent. Arkansas v. Dailey,* 977 F.2d 428, 434 (8th Cir.1992) (whether agency took "hard look" at the problem is factor to be considered by court in determining whether agency's decision is arbitrary and capricious).

The Court will not expand the standard of review to be used in reviewing EPA's actions in this instance. That standard is clearly spelled out in the CERCLA statute. Furthermore, as the Eighth Circuit stated in *NEPACCO,*

Because determining the appropriate removal and remedial action involves specialized knowledge and expertise, the choice of a particular cleanup method is a matter within the discretion of the EPA. The applicable standard of review is whether the agency's choice is arbitrary and capricious. As explained in *United States v. Ward,*

[i]f [appellants] wish the court to review the consistency of [the government's] actions with the NCP, then they are essen-

tially alleging that the EPA did not carry out its statutory duties. The statute provides liability except for costs "not inconsistent" with the NCP. This language requires deference by this court to the judgment of agency professionals. [Appellants], therefore may not seek to have the court substitute its own judgment for that of the EPA.. [Appellants] may only show that the EPA's decision about the method of cleanup was "inconsistent with the NCP in that the EPA was arbitrary and capricious in the discharge of their duties under the NCP". 810 F.2d at 748 (quoting *United States v. Ward,* 618 F.Supp. 884, 890 (E.D.N.C.1985)). *See also United States v. Akzo Coatings of America, Inc.,* 949 F.2d 1409, 1424–25 (6th Cir.1991) ( reviewing court should not attempt to substitute its judgment for the expertise of EPA officials; task is to search for errors of procedure and serious omissions of substantive evidence, not to reformulate a scientific clean-up program developed over the course of months or years).

Defendants raise a number of issues in support of their position that the United States is not entitled to its costs. The Court will address each of these before deciding the United States' motion for summary judgment on costs.

### Cancer Potency Factor

■ Hercules contends that EPA used too conservative a cancer potency factor in the calculation of dioxin cleanup standards for the soil and sediments at the Vertac site. EPA states that it considered lower standards, and selected the 1 ppb cleanup standard for the off-site residential areas in 1990 and the 5 ppb cleanup standard in the 1996 OU # 2 ROD for the on-site areas in which future industrial use could be expected. The cancer potency factor used by EPA was fully explained in the RODs for the Off-site areas and for OU # 2, in risk assessments performed for the site, and in an extensive scien-

tific research document issued by EPA in 1985 (Health Assessment document). It specifically considered Hercules' comments, as well as the proposal of Hercules' contractor, ChemRisk.[8] The cancer potency factor was subjected to peer review, discussed in a public forum, and reviewed and approved by the EPA's independent Science Advisory Board.

In selecting remedial actions, the EPA is directed to

establish acceptable exposure levels that are protective of human health and the environment and shall be developed by considering the following ... [f]or systemic toxicants, acceptable exposure levels shall represent concentration levels to which the human population, including sensitive subgroups, may be exposed without adverse effect during a lifetime or part of a lifetime, incorporating an adequate margin of safety.

40 C.F.R. § 300.430(e)(2)(i).

EPA chose to use a cancer potency factor premised on the most conservative assumption, which it opined would provide the greatest protection for the public health and the environment. In light of the scientific uncertainty about a "safe level" for dioxin, EPA's choice was reasonable. While Hercules may disagree with EPA's more conservative number, the Court cannot say that the EPA's decision to use the standards it did was in any way arbitrary, capricious or not in accordance with the law.[9]

■ Hercules also argues that the EPA's cancer potency factor constitutes a rule under the Administrative Procedures Act (APA) that must be overturned because it was not subject to notice and comment. Courts have established a two-part test to determine whether a particular statement by an agency is a legislative rule or policy: (1) a policy statement, as opposed to a rule, does not have binding effect, that is, it does not impose any rights and obligations, and (2) a

8. ChemRisk suggested that EPA use a lower cancer potency factor based on its evaluation of some new scientific papers that had been issued subsequent to EPA's Health Assessment. ChemRisk proposed cleanup standards of 28 ppb for residential areas and 113—209 ppb for industrial areas.

9. As the Court has previously stated, it will not turn the cost phase of the proceedings into a scientific debate over the dangers of dioxin.

policy genuinely leaves the agency and its decision makers free to exercise discretion. *McLouth Steel Products Corp. v. Thomas,* 838 F.2d 1317, 1320 (D.C.Cir.1988) (citations omitted). *See Syncor Int'l Corp. v. Shalala,* 127 F.3d 90, 94 (D.C.Cir.1997) (primary distinction between rule and general statement of policy turns on whether agency intends to bind itself to a particular legal position).

The Health Assessment Document which set forth the cancer potency factor does not impose any rights of obligations. It is at most only a technical and advisory report. It did not obligate the agency or public in determining acceptable risks associated with dioxin. *See Industrial Safety Equipment Assoc., Inc. v. EPA,* 837 F.2d 1115, 1120–21 (D.C.Cir.1988) (guide by EPA and NIOSH recommending certain respirators did not constitute rule). *See also Natural Resources Defense Council, Inc. v. EPA,* 16 F.3d 1395, 1406–07 (4th Cir.1993) (EPA water quality dioxin criteria document is scientific reference manual and useful guide, but is not binding on any agency and has no legal effect).

With regard to the second element, the Regional Administrator of EPA Region 6 exercised discretion in deciding whether to apply the cancer potency factor to the cleanup of the site. EPA considered the effects of the lower figure proposed by ChemRisk and rejected it. Furthermore, in 1996, the Regional Administrator also reevaluated the toxicity of dioxin based on a 1994 draft Dioxin Reassessment Document. While she ultimately did not select a different cancer potency factor, her consideration of other data establishes that she was not bound by the 1985 document or the cancer potency factor set forth in it.

In addition, Hercules had the opportunity to, and did, comment on EPA's application of the cancer potency factor with regard to the cleanup levels at the site. EPA considered and responded to those comments when issuing its final RODs.

This argument is without merit.

***Exposure Assessments***

[redacted] Hercules argues that the exposure assessments used by EPA did not justify a remedial order. Hercules throws out numbers and absurd hypotheticals to support its contention. For example, Hercules posits that EPA's assessments are based on teenagers riding their bicycles on the landfills or people rooted all day to a portion of the sewage treatment plant, eating dirt by the handful. Hercules argues that EPA used "unrealistic" exposure assumptions along with its cancer potency factor to create imaginary risks to justify a remedial order.

For known or suspected carcinogens, acceptable exposure levels under the NCP "are generally concentration levels that represent an excess upper bound lifetime cancer risk to an individual of between $10^{-4}$ and $10^{-6}$ using information on the relationship between dose and response." 40 C.F.R. § 300.430(e)(2)(i)(A)(2). There is no requirement that a certain number of people be exposed. Rather, the NCP requirement is designed to protect an individual from an increased risk of contracting cancer as a result of exposure to hazardous substances. The numbers may be high, and perhaps, as Hercules implies, a bit overcautious, but the Court cannot find that the assessments are arbitrary and capricious. They are based on observations, discussions with local officials and residents, and review of zoning ordinances. According to reports from site evaluations in the residential areas, children routinely played in the Rocky Branch creek, some of the flood plain areas were used for grazing and crop production, sludge drying beds were being used for vegetable gardens, and a mobile home was located within 1000 feet of the highly contaminated dioxin drums.

EPA was justified in assuming that residents could be exposed to dioxin contaminants from the site. As such, the Court finds that EPA's exposure assessments and cleanup standards were not arbitrary and capricious.

***Risks to Workers***

[redacted] In a somewhat innovative, yet unpersuasive, argument, Hercules contends that the remedies were not "cost effective" because EPA failed to consider the risks of injuries and fatalities to workers involved in response activities. According to Hercules, the risk of death to workers involved in the

clean up was greater than the risk of death by possible exposure to dioxin.

Hercules cannot point to anything in the Administrative Record to show that EPA did not consider worker safety. Furthermore, assessment of the risks associated with traveling to and working at the Site is not required by the NCP in determining whether the remedial choice is "cost effective."

### Incineration of Drummed Wastes

The main argument advanced by both Uniroyal and Hercules is that EPA arbitrarily and capriciously characterized, handled and incinerated the 2,4–D waste. The arguments are basically two-fold: first, that the EPA's decision to treat the drums of 2,4–D waste as F-listed wastes was arbitrary and capricious, and concomitantly, that the EPA arbitrarily and capriciously decided to incinerate the waste; second, that EPA's determination to treat incineration as a removal action rather than remediation was inconsistent with the NCP.

#### Characterization of the Wastes

■ In 1980, EPA concluded that the 2,4–D wastes had been contaminated with tetrachlorodiabenzo-o-dioxin ("TCDD"). On February 26, 1980, EPA issued a proposed rule under the Toxic Substances Control Act ("TCSA") to prevent Vertac from disposing of TCDD wastes from the Jacksonville site. The rule became effective March 11, 1980. (45 Fed.Reg. 15592) (proposed Feb. 26, 1980). This regulation, known as the "Vertac Rule," became final in May 19, 1980 (45 Fed.Reg. 32676).

According to testimony at the hearing on the proposed rule, Vertac had approximately 3,200 drums of TCDD-containing wastes resulting from the production of 2,4–D. The wastes contained "TCDD because the equipment used to produce 2,4–D had been used previously to produce 2,4,5–T and the equipment remained contaminated with TCDD after production shifted from 2,4,5–T to 2,4–D." 45 Fed.Reg. 32677. "Vertac testified that it had analyzed three samples from the 700 drums of wastes resulting from the initial production of 2,4–D on the contaminated equipment and found TCDD levels of approx-

imately twenty parts per billion (ppb)." 45 Fed.Reg. 32678.

The 1980 Vertac Rule provided that wastes could be disposed of in a PCB landfill if the wastes contained no "detectable levels of TCDD employing the TCDD detection methodology established by the Dioxin Monitoring Program." 45 Fed.Reg. at 32687. Vertac then sent samples of its 2,4–D wastes to Wright State University and to Monsanto for testing. The analyses by Wright State University found the first 700 drums contained 0.7 ppb 2,3,7,8–TCDD, 1.2 ppb total TCDD. Monsanto was not able to detect any TCDD at limits of detection below 1 ppb.

On April 4, 1983, EPA issued a proposed rule (48 Fed.Reg. 14514) stating its intent to regulate under RCRA "certain chlorinated dioxins, -dibenzofurans, and—phenols," and to terminate the TCSA listing made in 1980. The materials were considered acutely hazardous and designated as F-listed wastes. The Final Rule, published at 50 Fed.Reg. 1978 (January 16, 1985) became known as the "Dioxin Listing Rule." The materials contained in the Rule would be the "F–Listed" wastes which ultimately ended up being listed 40 C.F.R. § 261 App. VII.

Thus, in 1985, the wastes from the production of 2,4–D at the site became F-listed hazardous wastes, designated as F023.

Defendants contend that the 2,4–D wastes were not properly characterized as F-listed wastes. The Court disagrees. The 2,4–D wastes fall within the category F023. That category includes:

> Wastes ... from the production of materials on equipment previously used for the production or manufacturing use ... of tri- and tetrachlorophenols. .

40 C.F.R. § 261.31.

There is no dispute that 2,4,5–T wastes were highly contaminated with hazardous substances including 2,3,7,8–TCDD. Equipment used to make 2,4,5–T was also used to make 2,4–D. Thus, the wastes generated were F-listed wastes, regardless of the presence of dioxin. Furthermore, the Court has already found that there was cross-contamination between the 2,4–D and 2,4,5–T wastes and that the equipment was contaminated

even after Vertac abandoned the facility. *United States v. Vertac Chemical Corp.*, 966 F.Supp. at 1500.

The Hazardous and Solid Waste Amendments of 1984 ("HSWA") to RCRA, prohibited the land disposal of untreated hazardous wastes after specified dates. As of November 8, 1986, land disposal of dioxin containing hazardous waste number F023 was prohibited. 42 U.S.C. § 9624(e)(2)(A). However, the statute contained a temporary exemption through November 8, 1988, for disposal of contaminated soil or debris from a CERCLA response action. 42 U.S.C. § 9624(e)(3). Thus, after November 8, 1988, no F023 could be land disposed unless it met standards set by EPA.[10]

Under the standards set by EPA, F023 hazardous waste could not be land disposed unless the concentration of each constituent designated in the standard fell below certain levels. 40 C.F.R. § 268.40. These constituents can be just as toxic as dioxin. Wastes that met the applicable treatment standards could be disposed in a RCRA Subtitle C land disposal facility[11]

The 2,4–D waste contained most of the constituents in concentrations greater than the treatment requirements. For example, the analysis of a composite sample from the 700 drums conducted in late 1979 showed total TCDDs of 1.2. ppb, above the treatment requirement of one ppb. Samples collected on July 21, 1990, as part of the first trial burn for the on-site incinerator revealed total TCDFs (tetrachlorodiabenzo-p-furans) in excess of the treatment standard for F023. In addition, one sample contained 320 ppb total TCDDs.

Data from the 1991 test burn showed the presence of 12.6 ppb 2,3,7,8–TCDD in the solid fraction of 2,4–D waste (13.9 ppb total TCDDs) and 3.6 ppb 2,3,7,8–TCDD in the liquid fraction (10.6 ppb total TCDDs) analyzed. In addition, other constituents were present in the 2,4–D waste in excess of the treatment requirement for the constituents.

Uniroyal further argues that because all the drums of waste were not sampled by EPA, it was arbitrary and capricious to treat all of the drums as F-listed wastes. EPA argues that the costs of sampling the drums would have been prohibitive. Each drum would have had to be opened in a special environment with specialized tools by workers dressed in protective gear. The drums would have to be resealed. The United States has demonstrated that the cost of such individualized sampling would rival the cost of incineration. Given what the EPA knew about the content of the drums at the time they were listed, it would have been unreasonable for the EPA to spend millions of dollars to sample drums in hopes of finding ones that did not contain hazardous substances. *See United States v. Broderick Inv. Co.*, 963 F.Supp. 951, 954 (D.Colo.1997) (record supported EPA's assertion that obtaining accurate measure of solid concentration would be prohibitively expensive and time consuming, if not practically impossible. "[M]andating every imaginable study prior to remedy [or removal] selection would hopelessly delay EPA's important activities, and the benefit of such an exacting requirement is unclear.")

All the data available to EPA supported its conclusion that the 2,4–D waste required treatment before it could be land disposed. EPA examined multiple treatment options for the drummed waste and concluded that incineration was the only effective option. EPA states as a result of incineration, the 25,180 drums of 2,4–D wastes were reduced to 6,300 drums of ash and 33,000 drums of salt with no appreciable dioxin content. The ash could be treated and placed at RCRA Subtitle C landfill at minimal additional cost.

The Court concludes that the characterization of the D-wastes as F-listed was not arbitrary and capricious. Contrary to defen-

---

**10.** Uniroyal argues that EPA could have sent the drums to a landfill prior to the November, 1988 date. However, no facility would accept the waste, nor were containers available to ship it. Furthermore, EPA had not even finished stabilizing the drums.

**11.** There is no treatment standard for 2,3,7,8–TCDD itself. The treatment standard is for total TCDDs. Thus, a waste with no 2,3,7,8–TCDD but with total TCDDs greater than one ppb cannot be land disposed.

dants' assertions, the 2,4–D wastes met the requirements of the F023 listing. Furthermore, the 2,4–D waste did not meet the treatment requirements for landfill offsite. Incineration was appropriate under the circumstances.

*Response v. Remedial Action*

■ Uniroyal and Hercules further argue that EPA did not follow the requirements of the NCP in disposing of the drummed wastes as a removal action. EPA performed the work as a series of removal actions. This is permitted by the NCP and CERCLA. The United States contends that the incineration is a removal action, and that the requirements of the NCP for remedial actions do not apply.

Whenever there is a release or threat of release of any hazardous substance into the environment, Section 104 of CERCLA authorizes EPA to take response measures not inconsistent with the NCP. 42 U.S.C. § 9604(a). There is no dispute that there was a release of hazardous substances at the Site, as was previously found by the Court.

CERCLA and the NCP distinguish between removal actions and remedial actions.[12] The former are taken to "counter imminent and substantial threats to public health and welfare," while the latter "are longer term, more permanent responses." *State of Minnesota v. Kalman W. Abrams Metals, Inc.,* 155 F.3d 1019, 1024 (8th Cir.1998). "The NCP prescribes more detailed procedures and standards for remedial actions" than for removal actions. *Id. See* 40 C.F.R. §§ 300.410, 300.415 (requirements for removal actions); 40 C.F.R. §§ 300.420–300.435 (requirements for remedial actions). "However, a removal action is not converted into a remedial action just because it effects a permanent remedy." *Hatco Corp. v. W.R. Grace & Co.,* 849 F.Supp. 931, 962 (D.N.J. 1994). The proper classification of the cleanup is an issue of law. *Channel Master Satellite v. JFD Electronics Corp.,* 748 F.Supp. 373, 386 (E.D.N.C.1990).

EPA is authorized to perform removal actions where it determines that "there is a threat to public health or welfare of the United States or the environment." 40 C.F.R. § 300.415(b)(1). The NCP requires that EPA consider eight factors in determining the appropriateness of a removal action. These are:

(i) Actual or potential exposure to nearby human populations, animals or the food chain from hazardous substances or pollutants or contaminants;

(ii) Actual or potential contamination of drinking water supplies or sensitive ecosystems;

(iii) Hazardous substances or pollutants or contaminants in drums, barrels, tanks, or other bulk storage containers, that may pose a threat of release;

(iv) High levels of hazardous substances or pollutants or contaminants in soils largely at or near the surface, that may migrate;

(v) Weather conditions that may cause hazardous substances or pollutants or contaminants to migrate or be released;

(vi) Threat of fire or explosion;

(vii) The availability of other appropriate federal or state response mechanisms to response to the release; and

---

**12.** CERCLA defines removal actions as:
the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release.

42 U.S.C. § 9601(23).
Remedial actions are defined as:
actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment.
42 U.S.C. § 9601(24).

(viii) Other situations or factors that may pose threats to public health or welfare or the environment.

40 C.F.R. § 300.415(b)(2) (1990).[13]

When EPA decides to perform a removal action, it documents that decision in an "Action Memorandum" which sets forth the basis for the agency's determination that a threat exists and for the particular removal action selected. EPA also writes Action Memoranda to document a modification of the removal action or the need for additional financing or time.

The action memoranda reveal that before the drums were stabilized EPA was concerned with the risk of fire and explosion, tornadoes, exposure of nearby residents and the environment to the hazardous substances, and the release of contaminants to the soils. These threats, and EPA's concern about them, continued even after completion of the drum stabilization. According to EPA, the mere presence of the drums posed threats of fire and explosion and release of hazardous substances to nearby residents.

Incineration as a removal action was consistent with the NCP. The 1985 NCP, under which EPA stabilized the drums and supported the State incineration efforts, contains the following suggested removal actions: "[r]emoval of drums, barrels, tanks, or other bulk containers that contain or may contain hazardous substances or pollutants or contaminants—where it will reduce the likelihood of spillage, leakage, exposure to humans, animals or food chain, or fire or explosion." 40 C.F.R. § 300.65(c)(7) (1986). The 1990 NCP, under which EPA took over the incineration of the wastes, contains the same suggestions as the 1985 NCP with the addition of the following: "[C]ontainment, treatment, disposal, or *incineration* of hazardous materials—where needed to reduce

the likelihood of human, animal, or food chain exposure." 40 C.F.R. § 300.415(d)(8) (1990) (emphasis added).

EPA issued fifteen Action Memoranda for the drum removal action at the site. EPA consistently emphasized the threat of tornados and fire and explosion.

Removal actions, although of shorter duration, do not have to be. Pursuant to 40 C.F.R. § 300.415(b)(5), removals that will take more than a year or cost more than $2 million to complete are permitted where "there is an immediate risk to public health or welfare or the environment." *See* 42 U.S.C. § 9604(c)(1). In each of the Action Memorandum, EPA made the required findings.

Requiring EPA to use the remedial action process would have delayed the removal of the threat posed by the drums. A remedial action requires a long detailed RI/FS process which may take years to complete. The drums posed an imminent threat, that needed immediate response.

Uniroyal argues, however, that the time removal was chosen (1987) until the actual incineration of the 2,4–D waste was begun (1993) belies the government's argument that the action was taken in response to an immediate threat to public health. Uniroyal contends that within that time frame, EPA would have had an opportunity to do an RI/FS resulting in remedial action after full consideration of disposal alternatives.

Uniroyal's argument is without merit. It ignores the State's incineration efforts. EPA did not sit on its hands during that period of time. The record reflects that it performed a number of response actions to deal with the leaking drums, including overpacking, as well as provided support to the State's incineration efforts. The incineration of the drums

---

**13.** EPA's decision to utilize its removal action authority must be judged by the NCP in effect at the time the action was taken. *See United States v. Chapman*, 146 F.3d 1166, 1170 n. 3 (9th Cir. 1998). When EPA began its removal action, the 1985 NCP was in effect. *See* 50 Fed.Reg. 47912 (1985). On April 4, 1990, revisions to the NCP went into effect (the 1990 NCP). *See* 50 Fed. Reg. 8666(1990). While the 1985 NCP was substantially revised by the 1990 NCP, the core

requirements with regard to removal actions remained substantially the same. In the 1985 NCP, the factors to be considered in determining the appropriateness of a removal action are set forth in 40 C.F.R. § 300.65(b)(2), and the only difference is the first factor which is stated in the 1985 NCP as follows: "Actual or potential exposure to hazardous substances or pollutants or contaminants by nearby populations, animals, or food chain."

encountered significant delays, including lawsuits and problems with the trial burn.

"Even if the Court would have made a different decision regarding the proper action to be taken, the decision of the EPA will not be found to be inconsistent with the NCP unless it is in contravention of the NCP guidelines. Courts are required to uphold the EPA's response decision 'unless the objecting party can demonstrate, on the administrative record, that the decision was arbitrary, capricious or otherwise not in accordance with the law.'" *EPA v. TMG Enterprises*, 979 F.Supp. 1110, 1127 (W.D.Ky. 1997) (citations omitted). The term "removal action" is to be given a broad interpretation. *Kelley v. E.I. DuPont de Nemours & Co.*, 17 F.3d 836, 843 (6th Cir.1994).

Here, performing a removal action with regard to the drums enabled EPA to quickly address and to mitigate the threat posed to human health and the environment by the leaking, deteriorating drums of acutely hazardous waste left behind by Vertac. The drums remained an imminent threat. After EPA's arrival at the site in 1987, it took about 19 months to overpack and stabilize the drums. Even after being overpacked, continuous drum monitoring and maintenance were required as drum failures continued to occur. Furthermore, the fire and exposure threat remained, as did the threat presented by tornados. Incineration was specifically contemplated as an appropriate removal action. *See General Electric Co. v. Litton Indus. Automation Systems, Inc.*, 920 F.2d 1415, 1419 n. 4 (8th Cir.1990), *cert. denied*, 499 U.S. 937, 111 S.Ct. 1390, 113 L.Ed.2d 446 (1991) (NCP specifically contemplates excavations as appropriate removal actions).

The Court must defer to the expertise of the governmental agency. Thus, EPA's decision to take removal action in response to an immediate threat is entitled to the deference accorded decisions by a governmental agency. *Akzo*, 949 F.2d at 1424–1425.

Defendants cite a number of cases in support of their position that the use of a removal action rather than a remedial action was not in accordance with the NCP. However, in those cases there was no finding by a govern-

mental agency of an immediate threat. *See Sherwin–Williams Co. v. City of Hamtramck*, 840 F.Supp. 470, 475–76 (E.D.Mich. 1993) (city did not demonstrate imminent threat to health or safety and extended and protracted nature of cleanup indicated that city had engaged in remedial action); *Channel Master Satellite Sys., Inc. v. JFD Elecs. Corp.*, 748 F.Supp. 373, 384–86 (E.D.N.C. 1990) (site did not pose immediate risk of harm to public health or environment). *See also Minnesota v. Kalman W. Abrams Metals, Inc.*, 155 F.3d 1019, 1998 WL 635550 (8th Cir. Sept.17, 1998) (state's action did not qualify as removal and state would be held to NCP standards for remedial action because of state's failure to make determination required by § 300.415(b) of the NCP of threat to public health or welfare or the environment, permanent nature of the site cleanup and the leisurely manner in which state dealt with the problem site).

In sum, the Court finds that EPA appropriately performed the response action as a series of removal actions to mitigate the imminent threat posed by the leaking drums. The administrative record adequately documents the continuing risk to human health and environment of the drummed wastes. *See TMG Enterprises*, 979 F.Supp. at 1130 (length of time or permanency of remedy does not preclude finding that EPA conducted a removal action at the sites). The incineration of the drummed wastes was not arbitrary or capricious and was in accordance with the NCP.

### Constitutionality of CERCLA

In one final effort to avoid liability for costs, Uniroyal and Hercules argue that the Court must reexamine the constitutionality of CERCLA in light of the Supreme Court decision in *Eastern Enterprises v. Apfel*, 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998). In that case four justices concluded that the retroactive provisions of the Coal Industry Retiree Health Benefit Act of 1992 (the Coal Act), as applied to Eastern Enterprises, violated the Takings Clause of Fifth Amendment. Justice Kennedy concluded that the Coal Act, as applied, violated the Due Process Clause of the Fifth Amendment.

Defendants argue that *Eastern Enterprises* calls into question the retroactive application of CERCLA. They contend that they did not cause harm and therefore cannot be held to pay the costs of the cleanup associated with harms they did not cause or create. It is clear that defendants want to relitigate liability. They cannot do so. They have been found jointly and severally liable under CERCLA for the costs of the cleanup.

The Court has previously found CERCLA constitutional in the face of a retroactivity argument by Hercules. There is no basis to warrant reconsideration of the constitutionality of CERCLA. Both Uniroyal and Hercules have been found liable for the contamination at the Site. Therefore, they are responsible, jointly and severally, for the costs of the cleanup. *See NEPACCO*, 810 F.2d at 732–734 (retroactive application of CERCLA to impose liability for cost of cleanup not unconstitutional). *See also United States v. Olin Corp.*, 107 F.3d 1506, 1511–1515 (11th Cir.1997) (same). *Eastern Enterprises* is not applicable.

### Government's Request for Costs

CERCLA provides that responsible persons are liable for "all costs of removal or remedial action incurred by the United States Government .... not inconsistent with the [NCP]." 42 U.S.C. § 9607(a). The government seeks reimbursement of response costs from defendants in the amount of $102,878,641.35 including prejudgment interest, plus any additional response costs incurred by the United States through the date of judgment.[14]

In support of its motion for summary judgment, the government submitted the affidavits of Rick Ehrhart, Phillip Allen, and Kathleen Aisling. All three individuals are Remedial Project Managers (RPM) at the site and have personal knowledge regarding the response actions.

Defendants have moved to strike the affidavits of Ehrhart, Allen and Aisling on the basis that they contain matters beyond the administrative record, are inadmissible hearsay and are irrelevant..

The government states that the affidavits are admissible as summaries under Fed. R.Evid. 1006. The RPMs can also present testimony based on their personal knowledge of the actions taken as well as EPA practices.

The affidavits essentially summarize the actions taken as set forth in the administrative record and state that costs were incurred. Thus, they constitute summaries under Fed.R.Evid. 1006. They do not contain inaccurate or misleading information. The Court finds them relevant and admissible. To the extent they contain conclusions on matters that are left to the Court (such as a declaration that EPA followed the requirements of the NCP), the Court has disregarded those portions.[15]

Therefore the motions to strike the affidavits of the RPMS are denied.

Defendants do not dispute that EPA incurred costs. They have primarily argued that the actions taken by EPA were arbitrary, capricious and not in accordance with the NCP.[16] The Court has rejected those arguments, finding that EPA's actions were reasonable, and not inconsistent with the NCP.

Congress intended that the government recover all costs incurred in a remedial or removal action. "As long as the government's choice of action was not inconsistent with the NCP, its costs are presumed to be

14. The figure includes principal and interest incurred through July 31, 1997. Amounts included for the Jacksonville and Rogers Road Municipal Landfill sites are not applicable to Uniroyal. The total amount will also be subject to set off by any amounts collected by the government pursuant to prior settlements and various trust accounts associated with the Vertac site.

15. The Court agrees with Uniroyal and Hercules that the affidavits are not admissible as expert testimony under Fed.R.Evid. 702.

16. For example, Hercules has submitted a 110-page statement of material facts in dispute regarding the United States' claim for costs. Almost all the facts in dispute pertain to Hercules' arguments that EPA's choices were arbitrary and capricious. With respect to the specific issue of costs, Hercules contends that certain ADPC & E and RCRA costs are not recoverable and that costs associated with actions by Department of Justice's attorneys in litigation against the Phoenix parties are not recoverable. These latter two issues will be discussed *infra*.

reasonable and therefore recoverable." *Hardage,* 982 F.2d at 1443. "The only way a responsible party can escape liability for the government's costs incurred at a particular site is to demonstrate that the government's response actions—i.e., removal or remedial actions—underlying the costs are inconsistent with the NCP." *Id.* As discussed above, defendants have failed to meet their burden of showing that the actions were not consistent with the NCP and therefore that costs are not recoverable.

CERCLA provides for the recovery of *all* costs incurred by the United States not inconsistent with the NCP. 42 U.S.C. § 9607(a). *See NEPACCO,* 810 F.2d at 747–48. These include recovery for cost of investigating and monitoring the site; costs of designing and implementing removal and remedial actions; legal and enforcement expenses incurred in seeking to recover costs from a responsible party; and prejudgment interest. *See* 42 U.S.C. §§ 9601(23) and (24); 9604(a) and (b), 9607(a). The broad remedial purpose of CERCLA supports a liberal interpretation of recoverable costs, both indirect and direct costs are recoverable. *United States v. R.W. Meyer, Inc.,* 889 F.2d 1497, 1503–1504 (6th Cir.1989), *cert. denied,* 494 U.S. 1057, 110 S.Ct. 1527, 108 L.Ed.2d 767 (1990).

The government has requested costs (to date) as follows:

(a) Expenditures for contracts and other response costs in the amount of $76,256,-312.35. These include work performed under federal contracts for activities such as the incineration of the wastes, handling, maintenance and storage of the drummed waste, sampling and laboratory analysis of samples from the site, remedial investigations, remedial planning, and feasibility studies, and community relations.

(b) EPA payroll and travel costs in the amount of $2,027,263.83.

(c) EPA indirect costs in the amount of $4,224,031.55. These include costs necessary

to operate the Superfund program, but cannot be attributed directly to specific sites.

(d) State Cooperative Agreement costs in the amount of $205,503.00.

(e) Costs incurred by Agency for Toxic Substance and Disease Registry (ATSDR) in the amount of $927,661.59. ATSDR provides health studies and testing in the Vertac area communities affected by toxic substance contamination.

(f) Prejudgment interest in the amount of $17,332,509.10. Interest began accruing as of March 2, 1992, when the United States demanded payment of unreimbursed response costs incurred in connection with the site.

(g) Department of Justice (DOJ) costs in the amount of $1,904,759.93. These include payroll and travel costs, indirect costs, and prejudgment interest.

The total for costs incurred by the United States and prejudgment interest accrued is $102,878,641.35.

Hercules argues that the United States cannot recover any costs it reimbursed to ADPC & E as the State had settled its CERCLA claim against Hercules in a 1982 Consent Decree. Thus, any costs expended by ADPC & E cannot be charged to Hercules.

Hercules has failed to show how the settlement agreement between Hercules and the State is related to the costs the United States seeks from the State. They involve separate, unrelated matters, and the United States is entitled to recover its costs from the State.

Hercules also contends that certain costs are not recoverable because they are RCRA costs. The United States contends that all costs charged to the site are recorded under Superfund appropriation codes, and all enforcement activities taken were properly identified as CERCLA related costs. Hercules has not pointed to any specific item in the cost package which is a RCRA cost as opposed to a CERCLA cost. Thus, there is no basis to disallow any of the costs incurred prior to November 13, 1985.[17]

---

17. The United States also notes that RCRA costs are recoverable under CERCLA *NEPACCO,* 810 F.2d at 737.

Hercules argues that the enforcement costs should be reduced to reflect DOJ attorney time spent on efforts to obtain a receiver for Vertac in the 1980s. Hercules contends that the attorneys' failure to obtain service over the Phoenix parties amounted to malpractice and resulted in the government agreeing to a "cheap" settlement with the Phoenix parties.

The Court disagrees. The government attorneys did not engage in misconduct, or malpractice. Ultimately, the Phoenix parties were brought into the action and the Court approved a settlement with them as "fair and reasonable." The government is entitled to recover the DOJ costs, including its attorney fees. *See United States v. Chapman,* 146 F.3d at 1176 (United States entitled to its reasonable attorney's fees).

In sum, defendants have failed to demonstrate that the costs incurred by the United States are inconsistent with the NCP. Thus, the United States is entitled to judgment against the defendants in the amount of $102,878,641.35 plus any additional response costs incurred and to be incurred in this case.

## CONCLUSION

Accordingly, Hercules' motion for partial summary judgment (document no. 2273) is denied; Uniroyal's motion for partial summary judgment (document no. 2280) is denied; the United States' motion for summary judgment for costs against Hercules and Uniroyal (document no. 2283) is granted; Uniroyal's and Hercules' motions to strike the declarations of Ehrhart, Allen and Aisling (document nos. 2297 and 2301) are denied; and the United States' petition to exclude the expert testimony of Renate Dora Kimbrough (document no. 2337) is denied as moot. The allocation phase will begin November 2, 1998, at 9:30 a.m.