RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0041P (6th Cir.)
File Name: 01a0041p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

FRANKLIN COUNTY
CONVENTION FACILITIES
AUTHORITY,
          *Plaintiff-Appellee,*

   *v.*

AMERICAN PREMIER
UNDERWRITERS, INC.,
          *Defendant-Appellant,*

CONSOLIDATED RAIL
CORPORATION, et al.,
          *Defendants,*

UNITED STATES OF AMERICA,
          *Intervenor-Appellee.*

No. 99-4095

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 94-01050—Edmund A. Sargus, Jr., District Judge.

Argued: October 26, 2000

Decided and Filed: February 13, 2001

1

Before:  SUHRHEINRICH and MOORE, Circuit Judges;
            EDMUNDS, District Judge.[*]

---

**COUNSEL**

**ARGUED:** Jonathan A. Conte, PIERCE E. CUNNINGHAM COMPANY, Cincinnati, Ohio, for Appellant.  Richard A. Frye, CHESTER, WILLCOX & SAXBE, Columbus, Ohio, Louise F. Milkman, UNITED STATES DEPARTMENT OF JUSTICE, ENVIRONMENT & NATURAL RESOURCES DIVISION, Washington, D.C., for Appellees.  **ON BRIEF:** Jonathan A. Conte, Pierce Edward Cunningham, Thomas H. Stewart, PIERCE E. CUNNINGHAM COMPANY, Cincinnati, Ohio, for Appellant. Richard A. Frye, CHESTER, WILLCOX & SAXBE, Columbus, Ohio, John A. Gleason, BENESCH, FRIEDLANDER, COPLAN & ARONOFF, Columbus, Ohio, Louise F. Milkman, UNITED STATES DEPARTMENT OF JUSTICE, ENVIRONMENT & NATURAL RESOURCES DIVISION, Washington, D.C., for Appellees.

---

**OPINION**

---

   SUHRHEINRICH, Circuit Judge.  Defendant American Premier Underwriters, Inc. ("APU"), appeals the judgment for Plaintiff Franklin County Convention Facilities Authority ("CFA") following a bench trial in this cost-recovery action under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601- 9675, as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"),

---

   [*] The Honorable Nancy G. Edmunds, United States District Judge for the Eastern District of Michigan, sitting by designation.

not interfere with APU's reasonable invested backed expectations because CERCLA liability is "tied directly to the past actions of responsible parties." *See id.* at 743. In addition, the court found nothing unusual in the character of the governmental action. *See id.* at 744.

We agree with the district court that CERCLA, as retroactively applied to APU, does not violate the Takings Clause. Although the economic impact on APU of retroactive CERCLA application is potentially significant, it is also directly proportional to APU's prior acts of pollution. Retroactive CERCLA liability similarly does not interfere with APU's reasonable investment backed expectations, as that concept is discussed in *Eastern Enterprises*, because APU's liability directly relates to the acts of its predecessors, who expressly assumed liability for any claims concerning the land and who reasonably could have anticipated liability for environmental harms. Just as it was reasonable in *Turner Elkhorn* to impose retroactive liability for unforseen diseases relating to mining, it is reasonable here to impose retroactive liability for possibly unforseen costs of responding to environmental harms resulting from a party's disposal of waste. Finally, there is nothing unusual about the character of the governmental action in this case; Congress intended to spread the costs of present risks and liabilities, which were created in the past, to those who benefitted from their creation. Congress' intent is furthered by allocating liability to APU in this instance. Therefore, we conclude that retroactive application of CERCLA to APU does not violate the Takings Clause.

## IV.

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

---

100 Stat. 1613. APU makes eight arguments: (1) the material released at the site was never conclusively identified as a hazardous substance; (2) CFA did not incur response costs in a manner consistent with the National Oil and Hazardous Substances Pollution Contingency Plan ("NCP"), 40 C.F.R. Part 300, as required by CERCLA; (3) the hazardous material was not placed on the property while it was owned by a predecessor of APU; (4) CFA is not an innocent land owner under CERCLA; (5) even if the district court properly allowed CFA to include a contribution action, the district court abused its discretion by allocating 100% of the liability to APU under § 113; (6) the district court improperly allowed CFA to include a contribution action when it had only pleaded a response cost recovery action; (7) CFA's attorney fee award, totaling $10,818, was not a necessary response cost, as required by CERCLA; and (8) applying CERCLA retroactively to this case violates the Due Process and Takings Clauses. We **AFFIRM** for reasons slightly different than those given by the district court**.**

## I.

Defendant APU is the surviving corporate successor of several railroad companies, including Penn Central, the Cleveland, Columbus and Cincinnati Railroad Company ("CCC"), the Columbus and Xenia Railroad Company ("C&X"), and the Union Depot Company, all of which operated in Columbus, Ohio, beginning in the mid-nineteenth century. CFA is a public agency operating pursuant to Chapter 351 of the Ohio Revised Code.

Sometime prior to 1901, a wooden box filled with creosote and benzene,[1] measuring thirty-one feet by sixty-one feet by

---

[1] Creosote is a composition of a large number of chemicals, usually derived from coal tar, and frequently used as a wood preservative. In this case, tests conducted after the spill suggested that the creosote had been "thinned" with Benzene, a volatile, flammable and toxic liquid used chiefly as a solvent.

eleven feet, was buried near a railroad depot in Columbus. The box straddled two tracts of land that had been purchased by CCC and C&X in 1864, and had most likely been used as a tank for soaking wooden railroad ties, bridge timbers, and other materials. Records of the box disappeared over time, if they existed at all.

In 1973, the City of Columbus ("City") exercised its eminent domain authority over a parcel of property, which included the land upon which the box had been buried. By purchase agreement following an independent appraisal, the City paid Penn Central and other predecessors of APU the fair market value of $5,490,998.27 for the land. The portion of the land containing the box was acquired to the "Ohio Center Authority," one of the parties to the purchase agreement. Among other things, the railroad companies agreed to remain responsible for any "claims which may affect . . . any portion of the premises."

In October 1989, CFA commissioned a private consultant to conduct three environmental assessments for the property. These assessments attempted in part to identify storage tanks and hazardous substances using soil sampling, groundwater monitoring, examination of records, and other tests. None of the tests revealed the presence of the box. At the conclusion of the testing, CFA subleased the property from the City for the purpose of constructing a new convention facility.

In October 1990, a contractor hired by CFA was digging a storm sewer line with a backhoe when he accidentally split open the box. Some of the creosote and benzene mixture seeped into the ground, omitting a strong, objectionable odor. An environmental consultant was immediately called to the scene, and the Ohio Environmental Protection Agency ("Ohio EPA") was notified within several days. Chemical analyses performed by CFA's environmental consultant determined that the material was creosote mixed with benzene.

APU contends that its liability in this case is disproportional because there is no indication that its predecessors had experience with environmental regulation, the Supreme Court has expressly upheld the imposition of retroactive liability despite its departure from past regulatory regimes. *See Usery*, 428 U.S. at 16. Finally, we note that in 1973, when the land was transferred to the City, APU's predecessor corporation explicitly retained liability for any claims related to the property. Under these circumstances, retroactive application of CERCLA to APU does not violate due process.

**3.**

APU also argues that its liability in this case constitutes a violation of the Fifth Amendment Takings Clause, which prohibits taking private property for public use, without just compensation.[6] The aim of the Takings Clause is to prevent the government "from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960). Because the takings analysis focuses on "fairness and justice," it is necessarily an *ad hoc* standard. *See Kaiser Aetna v. United States*, 444 U.S. 164, 174-75 (1979). Notwithstanding, the Supreme Court has identified several factors which carry particular weight: "the economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the governmental action." *Id.*

The district court in this case concluded in a separate published opinion that retroactive application of CERCLA does not violate the Takings Clause. *See Franklin County Convention Facilities Auth.*, 61 F. Supp. 2d at 743-44. The court, using Justice O'Connor's takings analysis, determined that the potentially significant impact of liability on APU did

---

[6]Because *Eastern Enterprises* left unresolved whether a takings analysis applies in a case such as this, we must address the issue.

to pre-enactment conduct. *See R.W. Meyer, Inc.*, 889 F.2d at 1505-06. Even after *Eastern Enterprises*, courts have continued to uphold the constitutionality of retroactive application of CERCLA. *See, e.g., United States v. Alcan Aluminum Corp.*, 49 F. Supp. 2d 96, 100 (N.D.N.Y. 1999); *Combined Props./Greenbriar Ltd. P'ship v. Morrow*, 58 F. Supp. 2d 675, 677 (E.D.Va. 1999); *United States v. Vertac Chem. Corp.*, 33 F. Supp. 2d 769, 785 (E.D. Ark. 1998).

We conclude that *Eastern Enterprises* has no precedential effect on this case because no single rationale was agreed upon by the Court. *See Hertz v. Woodman*, 218 U.S. 205, 213-14 (1910) ("[T]he principles of law involved not having been agreed upon by a majority of the court sitting prevents the case from becoming an authority for the determination of other cases, either in [the Supreme Court] or in inferior courts"). Even if *Eastern Enterprises* did have precedential weight beyond its own facts, it is distinguishable from the instant case. First, Congress intended CERCLA to function retroactively. CERCLA's chief liability provision uses the past tense. *See* 42 U.S.C. § 9607(a)(2) (applicable to those who "owned" or "operated" a facility at the time a hazardous substance was disposed). Moreover, CERCLA reaches conduct that occurred prior to its passage because it authorizes government and private parties to clean up abandoned waste sites and then seek recovery of the costs from responsible parties. *See Northeastern Pharm. and Chem. Co., Inc.*, 810 F.2d at 733. Second, Congress acted rationally by spreading the cost of cleaning hazardous waste sites to those who were responsible for creating the sites. Cleaning abandoned and inactive hazardous waste disposal sites is a legitimate legislative purpose which is furthered by imposing liability for response costs upon those parties who created and profited from those sites. *See id.* at 733-34.

Here, apportioning liability to APU fulfills Congress' goal of spreading costs to responsible parties; APU's predecessor corporation benefitted from the use of the box, as well as its presumably inexpensive method of abandonment. Although

Within a week of discovering the box, CFA notified the City. Accounts of the box and its contents were published in the local newspapers, which continued coverage as significant events occurred. CFA Board meetings, which were open to the public and covered by local media, included oral and written status reports concerning the site. An executive director of CFA was designated to speak to community groups, to handle all media inquiries, and to respond to public records requests. In March 1991, the Ohio EPA prepared a detailed report on the pollution and the risks presented to the human and natural environment. CFA's environmental consultant also prepared a report with recommendations as to different methods of disposal. After considering its options, CFA tentatively chose to remove and transport the contamination to an off-site location. CFA prepared detailed job specifications, which were approved by the Ohio EPA, and consulted the United States EPA. The remediation was publicly bid to Foster Wheeler Enviresponse in August 1991.

On September 22, 1991, CFA sent a "demand" letter to APU expressly referencing CERCLA. The demand contained no dollar amount, but requested that "Penn Central . . . accept financial responsibility for remediation of the contamination." APU declined, and despite various written and oral invitations, did not request to investigate the box or comment upon the remediation.

The remediation began in October 1991. In the course of removing the creosote, Foster Wheeler discovered that it had migrated into approximately 45 feet of pea gravel surrounding a sewer line. Foster Wheeler erected a barrier to prevent further migration, excavated a significant amount of contaminated material around the box, and encapsulated the remaining contamination with compacted soil and concrete.

During the remediation, a contract dispute arose between CFA and Foster Wheeler, which had spent nearly $1 million on the cleanup – exceeding its authority by approximately $850,000. Ensuing litigation in the Ohio state courts resulted

in a verdict for CFA, which ultimately paid Foster Wheeler only $239,280.07.

On October 31, 1994, CFA commenced this action to recover the response costs it incurred in the remediation. On April 15, 1998, at the close of discovery, APU moved for summary judgment. The district court denied APU's motion, but resolved several relevant issues. First, it concluded that CFA, as a statutorily created government entity, was not a "state" within the meaning of CERCLA, and therefore had the burden of proving that its response costs were incurred in a manner consistent with the NCP.[2]    Second, it ruled that the NCP standards for a remedial action, 40 C.F.R. §§ 300.430 and 300.435, applied.[3]    Third, it ruled that CFA could proceed concurrently under both CERCLA § 107(a), for response cost recovery, and CERCLA § 113(f), for contribution, despite having only pleaded a cause of action for cost recovery.

On January 5, 1999, the United States intervened to defend the constitutionality of retroactive application of CERCLA.

---

[2]The NCP, although generally written to guide government cleanups, contains a set of guidelines applicable to private party response cost actions. *See* 40 C.F.R. § 300.700(c). This section states, among other things, that in the context of private party response cost actions, specifically enumerated portions of the NCP applicable to government cleanups are "potentially" applicable to private cleanups. *See id.*

[3]Under CERCLA, there are two varieties of response cost actions: remedial and removal. Removal actions, which are governed principally by 40 C.F.R. § 300.415, usually occur in the context of an emergency, and are considered temporary solutions. Remedial actions are defined as any action "consistent with [a] permanent remedy" taken to prevent or minimize the release of hazardous substances "so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment." 42 U.S.C. § 9601(24). The distinction between these two response actions becomes important in private response cost suits because of the requirement that recoverable costs be "consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B). The NCP preconditions for removal actions are more flexible than the requirements for remedial actions.

for some employees, including guaranteed health care benefits established by a series of collective bargaining agreements in the 1970's, were assigned to employers who had left the industry even before the 1970's agreements became operative. Five Justices agreed that this retroactive application of CIRHBA was unconstitutional, but no single rationale commanded a majority. Justice O'Connor, joined by Justices Rehnquist, Scalia and Thomas, concluded that CIRHBA amounts to an unconstitutional taking of property, but did not address the due process claim. *See id.* at 537-38. Justice Kennedy concurred in the judgment, but specifically rejected the takings analysis because there was no "specific property right or interest . . . at stake." *Id.* at 541-543. However, Justice Kennedy concluded that retroactive application of CIRHBA violated due process because severe liability was imposed regardless of the defendant's past conduct or any obligation that it had affirmatively undertaken. *See id.* at 540, 547-50. Justice Stevens, joined by Justices Souter, Ginsburg and Breyer, dissented, concluding that due process provided the proper analysis, but that there was no due process violation. *See id.* at 553, 556. Notwithstanding that the Court did not agree upon a single analytical framework, both opinions supporting the judgment emphasized that Eastern had left the coal industry before any collective bargaining agreement gave miners an expectation of guaranteed health benefits, and thus before Eastern could have undertaken any such commitments. *See id.* at 530-31, 532, 535-36 (plurality op.), 549-50 (Kennedy, J., concurring in judgment).

Prior to *Eastern Enterprises*, myriad courts had sustained the constitutionality of the retrospective application of CERCLA to pre-enactment conduct. *See, e.g., United States v. Monsanto Co.*, 858 F.2d 160 (4th Cir. 1988); *United States v. Northeastern Pharm. & Chem. Co., Inc.*, 810 F.2d 726 (8th Cir. 1986). This Circuit, in addressing whether SARA's prejudgment interest provisions should be retroactively applied, rejected the argument that retroactive application would result in manifest injustice, and concluded that CERCLA's liability provisions, as amended by SARA, apply

legislature acted in an arbitrary and irrational way is on the party complaining of the violation. *See Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976).

The issue here is squarely framed by examining two Supreme Court cases. First, in *Usery*, the Supreme Court decided a challenge to Title IV of the Federal Coal Mine Health and Safety Act of 1969, as amended by the Black Lung Benefits Act of 1972, 30 U.S.C. § 901, *et seq.*, which, *inter alia*, made coal mine operators responsible for paying benefits to miners who left employment in the industry before the statute's effective date. 428 U.S. at 14-15. A group of operators challenged this retroactive application under the Due Process Clause, arguing that "to impose liability upon them for former employees' disabilities is impermissibly to charge them with an unexpected liability for past, completed acts that were legally proper and . . . unknown to be dangerous at the time." *Id.* at 15. The Court upheld the statute's constitutionality, reasoning that liability for the effects of disabilities bred in the past is justified as a rational measure to spread the costs of the employees' disabilities to those who have profited from the fruits of the employees' labor. *Id.* at 18. In response to the operators' argument that their liability was disproportionate to the number of miners currently employed, the Court noted that "[i]t is enough to say that the Act approaches the problem of cost spreading rationally." *Id.* at 18-19. The Court expressly held that "our cases are clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations. This is true even though the effect of the legislation is to impose a new duty or liability based on past acts." *Id.* at 16 (citations omitted).

Second, in *Eastern Enterprises*, a deeply divided Court struck down retroactive application of the Coal Industry Retiree Health Benefit Act of 1992 ("CIRHBA"), 26 U.S.C. §§ 9701-22. 524 U.S. at 537-38 (plurality op.), 547 (Kennedy, J., concurring in judgment). There, under an allocation formula provided in CIRHBA, retirement benefits

After a bench trial, judgment was entered for CFA for $239,280.07, plus prejudgment interest. In a separate published memorandum and order, the court upheld the retroactive application of CERCLA to APU. *See Franklin County Convention Facilities Auth. v. American Premier Underwriters, Inc.*, 61 F. Supp. 2d 740, 743-44 (S.D. Ohio 1999).

## II.

We review *de novo* the district court's conclusions of law. *See Carter-Jones Lumber Co. v. Dixie Distrib. Co.*, 166 F.3d 840, 846 (6th Cir. 1999). We similarly review mixed questions of fact and law *de novo*. *See Wooldridge v. Marlene Indus., Corp.*, 875 F.2d 540, 545 (6th Cir. 1989).

The district court's factual findings are reviewed for clear error. *See id.* Considerable weight is afforded to findings of fact; they will be reversed only if we are left "with the definite and firm conviction that a mistake has been committed." *See Stevens v. McGinnis, Inc.*, 82 F.3d 1353, 1355-56 (6th Cir. 1996). Where two logically permissive interpretations of the evidence exist, the trial judge's selection cannot be adjudged clearly erroneous on appeal. *See Anderson v. City of Bessemer City, North Carolina*, 470 U.S. 564, 573-75 (1985). The clearly erroneous standard applies when findings are based entirely on physical or documentary evidence, as well as on inferences from other facts. *See id.*

## III.

CERCLA, as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), is a comprehensive environmental statute principally designed to effectuate two goals: (1) the cleanup of toxic waste sites; and (2) the compensation of those who have attended to the remediation of environmental hazards. *See Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 483 (1996). To establish a prima facie case for cost recovery under § 107(a), a plaintiff must prove four elements: (1) the site is a "facility"; (2) a release or threatened

release of hazardous substance has occurred; (3) the release has caused the plaintiff to incur "necessary costs of response" consistent with the NCP; and (4) the defendant falls within one of the four categories of potentially responsible parties. *See Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp.*, 153 F.3d 344, 347-48 (6th Cir. 1998). APU challenges the court's findings on all but the first element. In addition, APU challenges (1) the court's decision to simultaneously allow actions under CERCLA § 107 and § 113, (2) the apportionment of total liability to APU, (3) the award of certain attorney fees to CFA, and (4) the constitutionality of retroactive application of CERCLA.

## A.

APU contends that the substance in the box was never properly identified by CFA as a hazardous substance. Rather than creosote and benzene, APU suggests that the box could have contained some form of petroleum. A private plaintiff seeking to recover response costs must demonstrate that the material released was a hazardous substance. *See* 42 U.S.C. § 9607(a). Under CERCLA, petroleum and "any fraction thereof not specifically listed or designated as a hazardous substance" is excluded from the definition of a hazardous substance. *See* 42 U.S.C. § 9601(14). However, petroleum products mixed with hazardous substances not constituent elements of petroleum are hazardous substances. *See United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 267 (3d Cir. 1992) (holding that the petroleum exclusion was intended to exempt oil spills, not releases of oil that have become infused with hazardous substances through use).

APU's argument takes several forms. First, APU asserts that the district court improperly concluded that the burden of proving whether the substance was hazardous belonged to APU. Second, APU argues that the court's findings are not supported in the record because CFA chose not to perform additional tests which would have conclusively identified the substance. APU does not dispute the presence of benzene,

## H.

APU argues that the retroactive application of CERCLA violates substantive due process and amounts to an unconstitutional taking under the Fifth Amendment. We review this constitutional issue *de novo*. *See Carter-Jones Lumber Co.*, 166 F.3d at 845.

### 1.

As an initial matter, CFA argues that APU is estopped from challenging the constitutionality of CERCLA's retroactive application because APU's predecessor corporation, Penn Central, litigated the due process and takings issues in *Penn Central Corp. v. United States*, 862 F. Supp. 437 (Regional Rail Reorg. Ct. 1994). However, "preclusion . . . may be defeated by showing . . . that there has been a substantial change in the legal climate that suggests a new understanding of the governing legal rules which may require different application." 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure*, § 4425, at 253-54 (1981). Although myriad courts have upheld the constitutionality of CERCLA's retroactive application, the Supreme Court recently decided *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998), in which the Court invalidated retroactive application of the Coal Industry Retiree Health Benefit Act of 1992 ("Coal Act"), 26 U.S.C. §§ 9701-22. Because *Eastern Enterprises* signals a change in the legal climate, we reject CFA's preclusion argument.

### 2.

APU contends that retroactive application of CERCLA violates substantive due process. In general, due process is satisfied "simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose." *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 730 (1984). Legislative acts adjusting the burdens and benefits of economic life carry a presumption of constitutionality, and the burden of proving that the

### G.

APU argues that the $10,818 award for attorney fees incurred by Steven Gentry, CFA's independent attorney, was not a "necessary" response cost. As stated above, CERCLA permits recovery of "any . . . necessary costs of response incurred . . . consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B). Litigation-related fees are not recoverable, but legal work that is closely tied to the actual cleanup – work that benefits the entire cleanup and serves a statutory purpose other than cost reallocation – may constitute a necessary cost of response. *See Key Tronic Corp. v. United States*, 511 U.S. 809, 819-20 (1994). For example, work performed in identifying potentially responsible parties is recoverable. *See id.*

APU contends that the portion of the attorney fees awarded to CFA for work performed in preparing waste manifests is not a necessary response cost. Moreover, APU asserts that CFA should not have been awarded fees for work performed in identifying potentially responsible parties because Gentry did not identify APU as a potentially responsible party.

The district court concluded that Gentry's fees were not litigation-related, but were closely tied to the actual cleanup and therefore recoverable by CFA. We agree. Gentry's work with the waste manifests and identifying potentially responsible parties was a necessary cost of response because it arose during the cleanup process, had nothing to do with any litigation, and benefitted the cleanup as a whole by increasing the probability that the cleanup would be effective. Moreover, *Key Tronic Corp.* expressly approves of attorney fees in connection with identifying potentially responsible parties, and we are unpersuaded by APU's assertion that an attorney seeking to identify such parties must actually identify those who will ultimately be responsible for payment. Rather, as indicated in *Key Tronic Corp.*, it is enough that CFA's actions increased the probability of an effective cleanup. 511 U.S. at 820. Thus, we affirm the district court on this issue.

but contends that benzene is a constituent of gasoline and other petroleum products which would have qualified for the petroleum exception. Third, APU asserts that the district court erroneously relied on witness testimony that the material smelled like creosote, even though witnesses testified that odor is not an accurate method of identifying a substance. Fourth, APU argues that the court's conclusion that the material was creosote and benzene is contradicted by evidence in the record. To support this final contention, APU points to a long list of facts which the court allegedly overlooked, including (1) an article from 1884 suggesting that wood could not be treated by "oils lighter than water," such as benzene, (2) an article from 1930, approximately thirty years after the latest date upon which the box could have been buried, suggesting that wood could be treated with creosote diluted with lighter petroleum products such as benzene, and (3) an expert witness who testified that benzene was not used to thin creosote until 1909. APU adds that the court ignored ample evidence showing that the substance was some derivative of petroleum: (1) railroads in the late nineteenth century manufactured gas from petroleum that was piped to waiting passenger cars; (2) a "roundhouse," associated with oil used for maintenance purposes, was on adjacent property; (3) annual reports from area railroads for 1874 and 1875 which show expenditures for oil, but none for creosote; (4) the presence of underground petroleum storage tanks in the area; and (5) the existence of oil refining businesses in the area prior to 1900.

The district court concluded that the material in the box was creosote diluted with benzene, possessing sufficient strength upon testing in 1990 to constitute a hazardous substance under CERCLA. In addition to environmental testing performed in 1990, the court based this finding on circumstantial evidence, including nineteenth century literature which suggested that creosote thinned with a volatile oil could be used to treat wood products. The court specifically rejected APU's theory that the box and its contents could have been used by oil refining businesses

existing in the area because no evidence associated oil businesses with the property in question, and such a conclusion would be too attenuated and speculative. The court also rejected APU's contention that additional testing should have been performed, finding that "no indication was given in the Ohio EPA reports and consultations that the Agency believed more or different chemical testing was in order." The court concluded that to require additional testing, especially in view of the undisputed presence of benzene in levels which made the substance a hazardous waste, would undercut a primary purpose of CERCLA by discouraging voluntary, private cleanup efforts. Finally, the court noted that even though APU had notice of the spill in September 1991, it never requested independent tests.

We affirm the district court because its findings are supported by the record and we are not left with the definite and firm conviction that a mistake has been committed. Four witnesses testified that creosote has a distinctive odor, and all three witness who observed the box on the site identified the substance as creosote based on their familiarity with the chemical's odor. The district court was free to assign heavier weight to the testimony of the three witnesses who identified the substance as creosote, than to the notion that smell is not a reliable method of identifying a chemical. In any event, evidence suggests that creosote was commonly used, in combination with other substances like benzene, as a preservative for wood products. Perhaps most importantly, laboratory testing indicated that benzene was present in a quantity sufficient to require treatment as a hazardous substance under CERCLA.

Although APU's evidence relating to local petroleum businesses raises the specter that the substance might have been some form of petroleum, the inference is weak because nothing in the record connects the petroleum businesses with the property at issue. The mere proximity of petroleum businesses is not sufficient to render the court's finding clearly erroneous. Moreover, that benzene is a constituent of

*States v. R.W. Meyer, Inc.*, 932 F.2d 568, 573 (6th Cir. 1991) (holding that a court may take into account "more varying circumstances than common law contribution," including the state of mind of the parties, their economic status, any contracts between them bearing on the subject, any traditional equitable defenses, and any other factors deemed appropriate to balance the equities in the totality of the circumstances).

We reject APU's argument. Although the court concluded that CFA was not subject to CERCLA liability as an innocent landowner under § 107, it also concluded, alternatively, that "even if this determination were incorrect, this Court would adjudge defendant American Premier responsible for a 100% contribution share under § 113." Specifically, the court reasoned that "equitable factors," such as APU's refusal to participate in cleanup efforts despite notice from CFA, militate for this result. Additionally, we note that APU's predecessor, in its agreement with the City of Columbus, agreed to remain responsible for any "claims which may affect . . . any portion of the premises." Mindful of the broad discretion of the district court, we cannot conclude on these facts that the court abused its discretion by allocating total liability to APU.

**F.**

APU argues that the district court, in its pretrial order, improperly allowed CFA to assert a concurrent contribution action under CERCLA § 113(f) because the complaint pleaded only a response cost recovery action under CERCLA § 107(a). We review the district court's decision for abuse of discretion.

Here, the district court did not abuse its discretion because an order entered after a pretrial conference supersedes the pleadings. *See* 3 *Moore's Federal Practice*, § 16.78[3] (Matthew Bender 3d ed. 1999). Therefore, we affirm the district court on this issue.

material up and holding it in place before it reached [the] concrete sewer line [trench]," it is clear that this natural barrier was insufficient to prevent further contamination. Eventually, CFA erected a barrier to avoid further migration, but this did not occur until late November 1991, more than a year after the box was discovered, and more than eight months after the Ohio EPA, as part of its Preliminary Assessment, notified CFA that the "creosote may have gotten into a seam of the sewer pipe or may migrate down the channel of the sewer." Under these circumstances, we cannot conclude that CFA acted with due care with respect to the contamination. We therefore reject the court's determination that CFA qualifies for CERCLA's innocent landowner exception.

### E.

APU argues that the district court should have allocated some portion of the total liability to CFA. Because we have concluded that CFA is not immune from CERCLA liability as an innocent landowner, CFA's cause of action under CERCLA is properly characterized as an action for contribution under § 113(f). We must therefore address APU's argument.

Congress added § 113(f), an express authorization of claims for contribution, as part of SARA, which was enacted in 1986. *See* Superfund Amendments and Reauthorization Act of 1986, Pub.L. No. 99-499, § 113(f), 100 Stat. 1613, 1647 (codified as amended at 42 U.S.C. § 9613(f)(1)). Section 113(f)(1) states that "[a]ny person may seek contribution from any other person who is liable or potentially liable under [CERCLA § 107(a)]" for response costs. 42 U.S.C. § 9613(f)(1). In resolving contribution claims, "the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." *Id.* The apportionment of CERCLA liability under § 113(f) among various responsible parties is an equitable undertaking within the broad discretion of the district court. *See United*

petroleum, but not creosote, also raises the possibility that the substance in the box might have been petroleum. However, this inference is not well supported in the record, and is insufficient to call the court's finding into question. We also note that APU, despite receiving notice prior to the remediation, did not suggest that additional testing was in order.

Finally, nothing in the court's decision suggests that it decided this issue based on the burden of proof. Regardless of whose burden it was, the evidence was sufficient to support the court's conclusion that the material in the box was creosote mixed with benzene.

Therefore, in light of the evidence supporting the conclusion that the box contained creosote mixed with benzene, and mindful of the deference that we must pay to the court's ability to judge witness credibility, we affirm the district court's finding that the substance in the box was a hazardous substance under CERCLA.

### B.

APU argues that CFA is not entitled to recover response costs because it did not incur those costs consistently with the NCP.[4] CERCLA authorizes a private plaintiff to recover from liable parties only "necessary" response costs that are "consistent" with the NCP. *See* 42 U.S.C. § 9607(a)(4)(B). It is undisputed that the NCP as amended in 1990 applies to this case. We review *de novo* the district court's conclusion that the remedial action substantially complied with the NCP and was a CERCLA-quality cleanup. *See Bedford Affiliates v. Sills*, 156 F.3d 416, 427 (2d Cir. 1998).

---

[4]The NCP has been promulgated by the EPA and "establish[es] procedures and standards for responding to releases of hazardous substances . . . ." 42 U.S.C. § 9605(a).

For the purpose of cost recovery under CERCLA § 107(a)(4)(B), a cleanup will be consistent with the 1990 NCP if, taken as a whole, it is in "substantial compliance" with 40 C.F.R. § 300.700(c)(5)-(6), and results in a "CERCLA-quality cleanup." 40 C.F.R. § 300.700(c)(3)(i). Immaterial or insubstantial deviation from the NCP will not deem the cleanup "not consistent." *See* 40 C.F.R. § 300.700(c)(4). Areas of the NCP which "potentially" apply, under 40 C.F.R. § 300.700(c)(5)(i)-(ix), to private party response actions, include, among others, provisions providing for worker health and safety, documentation and cost recovery, and identification of ARARS. Likewise, 40 C.F.R. § 300.700(c)(6) states that private parties undertaking response actions "should provide an opportunity for public comment concerning the selection of the response action" based on "potentially" applicable NCP public notice and comment procedures.

A "CERCLA-quality cleanup" is a response action that (1) protects human health and the environment, (2) utilizes permanent solutions and alternative treatment technologies or resource recovery technologies to the maximum extent practicable, (3) is cost-effective, (4) satisfies Applicable and Relevant or Appropriate Requirements ("ARARS") for the site, and (5) provides opportunity for meaningful public participation. *See* National Oil and Hazardous Substances Pollution Contingency Plan, 55 Fed. Reg. 8666-01, 8793 (March 9, 1990).

The district court concluded that CFA substantially complied with the NCP. APU disagrees, arguing that CFA failed to (1) meet the NCP's technical requirements for Remedial Investigation, Feasibility Study, Remedial Design, and Record of Decision ("RI/FS/ROD/RD"), (2) identify and satisfy ARARS, (3) provide notice and meaningful opportunity for public comment throughout the remediation, (4) notify APU of its potential liability, (5) consider alternative treatment technologies, and (6) perform a cost-effective remediation.

any hazardous substance or pollutant or contaminant) . . . ." 42 U.S.C. § 9601(22).

APU contends that CFA is not an innocent landowner because CFA's contractor split open the box, releasing the hazardous substance. Additionally, APU asserts that CFA did not exercise due care once the material was released because CFA failed to erect a barrier to prevent the creosote from spreading. APU supports its position that CFA should have erected a barrier with expert testimony that a barrier was required to meet the standard of care in the industry. APU also cites several cases from other circuits which suggest that a party responsible for "moving" a hazardous substance throughout a site, such as by spreading it to uncontaminated portions of the land, may incur CERCLA liability. *See Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1511-12 (11th Cir. 1996); *Tanglewood E. Homeowners v. Charles-Thomas, Inc.*, 849 F.2d 1568, 1573 (5th Cir. 1988). In response, CFA does not argue that, as sublessee of the property, it is not an owner or operator within the meaning of CERCLA; rather, it contends only that the innocent landowner defense applies.

The district court concluded that CFA was an innocent landowner. We disagree. First, we note that CFA played no role in placing the hazardous substance at the site, nor could have reasonably been aware of the box's presence. Moreover, even though CFA's contractor split open the box, this was accidental and unavoidable, and cannot fairly be attributed to CFA. *Cf.*, *e.g.*, *Tanglewood E. Homeowners*, 849 F.2d at 1573 (party filled several creosote pools with soil and then spread the creosote-tainted soil over the entire site). Nevertheless, we think that CFA failed to exercise due care after discovering the box. Although it immediately ceased work and contacted an environmental consultant, for some unexplained reason CFA allowed a significant amount of creosote to migrate approximately forty-five feet, through an open sewer trench. Although CFA claims that there was a "dam of sorts from dirt and debris that was backing the

*v. 150 Acres of Land*, 204 F.3d 698, 703-04 (6th Cir. 2000). CERCLA defines a "release" as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing

---

an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant . . ., if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions . . . .

42 U.S.C. § 9607(b)(3).    The CERCLA definitions state:

    (35)(A) The term "contractual relationship" . . . includes, but is not limited to, land contracts, deeds or other instruments transferring title or possession, unless the real property on which the facility concerned is located was acquired by the defendant after the disposal or placement of the hazardous substance on, in, or at the facility, and one or more of the circumstances described in clause (i), (ii), or (iii) is also established by the defendant by a preponderance of the evidence:
    (i) At the time the defendant acquired the facility the defendant did not know and had no reason to know that any hazardous substance which is the subject of the release or threatened release was disposed of on, in, or at the facility.
. . . .
    (B) To establish that the defendant had no reason to know, as provided in clause (i) of subparagraph (A) of this paragraph, the defendant must have undertaken, at the time of acquisition, all appropriate inquiry into the previous ownership and uses of the property consistent with good commercial or customary practice in an effort to minimize liability. . . .

42 U.S.C. § 9601(35).

---

First, we reject APU's contention that CFA did not substantially comply with the NCP's RI/FS/ROD/RD requirements. The RI/FS, as defined in 40 C.F.R. § 300.5 and governed principally by 40 C.F.R. § 300.430, is intended to determine the extent of contamination and possible remedies. *See United States v. Akzo Coatings*, 949 F.2d 1409, 1419 (6th Cir. 1991). RI emphasizes data collection and site characterization, while the FS uses that data to define the objectives of the response action and to develop remedial action alternatives. *See* 40 C.F.R. § 300.5. The ROD is a document setting forth the proposed remedy as recommended in the RI/FS. *See Akzo Coatings of America, Inc.*, 949 F.2d at 1419. The RD stage includes the actual design of the selected remedy, as well as its implementation. *See* 40 C.F.R. § 300.5. Here, CFA initially hired an environmental consultant to investigate the site. The Ohio EPA also conducted an assessment of the site. CFA considered numerous options for the remediation, as presented by its environmental consultant, and developed a remediation plan that ultimately was approved by the Ohio EPA. Finally, each step in the remediation process was well documented by CFA. Under these circumstances, we conclude that CFA substantially complied with the NCP's RI/FS/ROD/RD requirements.

Second, we reject APU's argument that CFA did not substantially comply with its obligation to identify and comply with ARARS. Although CERCLA does not define ARARS, it requires that remedial actions result in a level of cleanup that at least meets the legally applicable or otherwise relevant and appropriate federal (or stricter state) requirements. *See* 42 U.S.C. § 9621(d)(2)(A). "Applicable requirements" are defined in the NCP as "those cleanup standards, standards of control, and other substantive requirements, criteria, or limitations promulgated under federal environmental or state environmental or facility siting laws that specifically address a hazardous substance, pollutant, contaminant, remedial action, location, or other circumstance found at a CERCLA site." 40 C.F.R. § 300.5.

"Relevant and appropriate" requirements are "those cleanup standards, standards of control, and other substantive requirements, criteria, or limitations promulgated under federal environmental or state environmental or facility siting laws that, while not 'applicable' to a hazardous substance, pollutant, contaminant, remedial action, location, or other circumstance at a CERCLA site, address problems or situations sufficiently similar to those encountered at the CERCLA site that their use is well suited to the particular site." *Id.* Here, we agree with the district court that the significant involvement of the Ohio EPA, including its preliminary report outlining the dangers presented to the human and natural environment, as well as the involvement of the United States EPA, with whom CFA consulted on a limited basis, is strong evidence to suggest that CFA satisfied its obligation to meet ARARS. Moreover, nothing in the record suggests that the cleanup violated any relevant and appropriate federal or state requirement.

Third and fourth, we conclude that CFA substantially complied with the public notice and comment requirement, and provided adequate notice to APU. In 40 C.F.R. § 300.700(c)(6), the NCP identifies notice and comment requirements that are potentially applicable to private remedial actions. First, a private party may be required to provide the public with prompt and accurate information regarding the incident, and to establish a method for disseminating information, such as through an on-scene news office. *See* 40 C.F.R. § 300.155. Second, 40 C.F.R. § 300.430(c) requires that a party solicit concerns from the public and prepare a formal community relations plan. Third, a private party may have to comply with 40 C.F.R. § 300.430(f)(2)-(3), which requires, among other things, a publicly available report describing the preferred remedy along with various alternatives, and a reasonable opportunity, not less than 30 calendar days, for comment. Similarly, 40 C.F.R. § 300.430(f)(6) requires that a copy of the ROD be made available for public inspection. Lastly, 40 C.F.R.

have been built by Native Americans or early settlers, who had been engaged principally in farming or other non-industrial activity. Taking note of nineteenth century literature which suggested that creosote and related materials were used to preserve wood, the court concluded that the box had been used as a pit or tank for soaking railroad ties, bridge timbers, and other wooden material.

The district court did not clearly err. Although APU objects to the absence of direct evidence linking the box to any of APU's predecessors, there is nothing objectionable in basing findings solely on circumstantial evidence, especially where the passage of time has made direct evidence difficult or impossible to obtain. We accord great deference to the district court's factual findings, which in this case were meticulously drawn from a record that may have supported competing conclusions. Because there is no clear error, we affirm.

### D.

APU argues that the court erred in concluding that CFA qualifies for CERCLA's "innocent landowner" defense, set forth at 42 U.S.C. § 9607(b). As discussed above, CERCLA § 107(a) imposes liability on four classes of parties, including the present owner and operator of a vessel or a facility. CERCLA defines a "facility" as including "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located . . . ." 42 U.S.C. § 9601(9). An otherwise liable facility owner or operator can escape liability by demonstrating that the release or threatened release was caused solely by an act or omission of a third party.[5] *See* 42 U.S.C. § 9607(b)(3); *United States*

---

[5]More specifically, CERCLA exempts an otherwise liable owner or operator from liability if he can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by:

*Indus., Inc.*, 131 F.3d 1185, 1191 (6th Cir. 1997) (Martin, C.J., concurring).  Taken as a whole, CFA's remediation substantially complied with the NCP and resulted in a "CERCLA-quality" cleanup as that term has been described by the EPA.  To allow APU to avoid liability for its share of the response costs, under these circumstances, would undermine CERCLA's intended purposes.  We affirm on this issue.

## C.

APU argues that the district court improperly relied on circumstantial evidence to conclude that Penn Central, its predecessor corporation, was an owner or operator of the property at the time the hazardous substance was deposited.  We review the court's factual finding for clear error.

CERCLA imposes liability on, among others, "any person who at the time of disposal of any hazardous substance owned or operated any facility at which . . . hazardous substances were disposed of."  42 U.S.C. § 9607(a)(2).

In concluding that the box was owned by APU's predecessors, the district court relied on circumstantial evidence, which it set out in great detail in its findings of fact.  First, the court concluded that the box was not in use prior to September 1853, when a color lithograph of downtown Columbus was prepared.  The print shows that the land upon which the box was eventually buried was being used as a pasture, not for industrial activity.  Next, the court noted that the box straddled two pieces of property identified as tracts six and thirteen on a master property map maintained by APU.  These tracts were acquired for railroad use in 1864 jointly by C&X and CCC, and no record existed of an easement, lease agreement, or other joint use of the property prior to that date.  Thus, because the box straddled the tracts, the court concluded that it could not have been constructed prior to 1864.  Moreover, the court observed that the box had been very well constructed, and therefore was not likely to

§ 300.435(c) generally requires parties to continue providing notice and comment opportunities through the RD phase.

Here, the City was given notice in 1990, almost immediately after the incident.  APU was notified nearly a month prior to the commencement of the remediation.  The media covered significant developments at the site, as well as public CFA Board meetings, at which the remediation was discussed and opportunity for public comment given.  A CFA director was appointed to speak to community groups, to handle all media inquiries, and to respond to public records requests.

Notwithstanding these actions, CFA's compliance was not perfect.  Nothing suggests that CFA continued providing notice and comment opportunities throughout the RD stage, nor is it clear from the record how closely CFA adhered to the technical minutia of the notice and comment provisions.  Nevertheless, we conclude that CFA's shortcomings were immaterial and insubstantial deviations from the technical NCP requirements, and should not, on these facts, bar CFA from recovering its response costs.  We note that the district court expressly found that no residential neighborhoods were proximate to the CFA cite, and that no citizens' group or other organization ever contacted CFA about environmental problems of any kind.  The EPA, in explaining the substantial compliance standard, explicitly contemplated these types of findings: "[W]hat may be a significant deviation from procedures under one set of circumstances may be less serious in another (for example . . . some communities may express no interest in a site, resulting in fewer public meetings)."  National Oil and Hazardous Substances Pollution Contingency Plan, 55 Fed. Reg. at 8793-94.  Thus, although CFA's compliance with the NCP notice and comment requirements was not perfect, we conclude that any deviation was immaterial, insubstantial, and did not affect the overall quality of the cleanup.

APU cites *Pierson Sand & Gravel, Inc. v. Pierson Township*, No. 941472, 1996 WL 338624 (6th Cir. June 18, 1996) (unpub. per curiam), where we held that a private party plaintiff's failure to substantially comply with the NCP's public notice and comment requirement prevented recovery of response costs under CERCLA. *Pierson Sand & Gravel* is distinguishable on its facts. In that case, this Court found that improperly noticed and otherwise "incidental" opportunities for public comment would not satisfy the NCP. *See id.* at *2-4. There, the notice preceding one public meeting concerning an application for a landfill permit did not mention that alternatives for a remediation would be discussed. *See id.* A second meeting was held, but with similarly inadequate notice and only after a remediation plan had been adopted. *See id.* In the instant case, however, the public board meetings, regular media coverage, and appointment of a CFA director to speak to community groups and respond to public records requests provided direct notice and opportunity for comment, not merely incidental notice and opportunity for comment as in *Pierson Sand & Gravel*. Moreover, in *Pierson Sand & Gravel* there were no findings concerning the lack of community interest. Here, the district court specifically concluded that the affected area was not residential, and that there had been no real desire in the community to participate in the remediation process. Therefore, although this is a close issue, we distinguish *Pierson Sand & Gravel* and conclude that under the facts of this case, CFA substantially complied with its obligation to provide meaningful notice and opportunity for comment concerning the remediation.

Fifth, APU contends that CFA failed to consider and utilize alternative treatment technologies to the greatest extent possible. This argument is without merit. The record reveals that CFA's environmental consultant discussed numerous treatment alternatives in its report to CFA, including bioremediation, fuel blending, recycling, on-site incineration, and removal to a landfill. The report ultimately identified either encapsulation or removal to a landfill as the two most feasible options. Although APU contends that CFA

imprudently rejected alternatives such as fuel blending and recycling, given the analysis provided by CFA's consultant, we cannot conclude that CFA acted improperly in choosing to remove the waste to a landfill.

Finally, APU contends that the cleanup was not cost-effective. We disagree. To be consistent with the NCP, all remedial actions must be "cost-effective." *See* 40 C.F.R. § 300.430(f)(1)(ii)(D). Cost-effectiveness is determined by comparing overall effectiveness to cost. *See id.* Overall effectiveness is determined by evaluating three criteria: (1) long-term effectiveness and permanence; (2) reduction of toxicity, mobility, or volume through treatment; and (3) short-term effectiveness. *See id.* A remedy is cost-effective if its costs are proportional to its overall effectiveness. *See id.*

Here, CFA chose to remove much of the contamination to a landfill, and to encapsulate the remainder. In doing so, CFA incurred $239,280.07 in costs. While CFA could have saved up to $30,000 by opting for ecapsulation rather than removal, we conclude that this amount is insignificant when compared to the benefits CFA achieved in terms of permanence and reduction of mobility and volume by opting to remove as much of the contamination as possible. Therefore, we affirm the district court's finding that the remediation was cost-effective.

In sum, the district court properly determined that CFA substantially complied with the NCP. Although CFA's compliance was not perfect, the NCP requirements are not intended to be a checklist of required actions for private remediations. "[A]n omission based on lack of experience with the Superfund program should not be grounds for defeating an otherwise valid cost recovery action, assuming the omission does not affect the quality of the cleanup." 55 Fed. Reg. at 8793. In other words, CERCLA is to be liberally construed to serve its dual purposes of efficiently cleaning the environment, while at the same time holding responsible parties accountable for their actions. *See In re Eagle-Picher*